476 F.Supp. 1101 (1979)
UNITED STATES of America et al., Plaintiffs,
v.
STATE OF WASHINGTON et al., Defendants.
Civ. No. 9213.
United States District Court, W. D. Washington, Tacoma Division.
March 23, 1979.
Motion for Reconsideration Denied April 24, 1979.
*1102 Alan C. Stay, Thomas P. Schlosser and John H. Sennhauser, Evergreen Legal Services, Seattle, Wash., for plaintiffs Duwamish, Samish, Snohomish, Steilacoom and Snoqualmie Tribes.
Stan Pitkin, U.S. Atty., Harry J. McCarthy, Asst. U.S. Atty., Seattle, Wash., George D. Dysart, Asst. Regional Sol., Dept. of the Interior (now with U.S. Dept. of Justice, Portland, Or.), for the United States.
Lewis A. Bell, Bell, Ingram & Rice, Everett, Wash., for Tulalip Tribes.
Mason D. Morisset, Ziontz, Pirtle, Morisset, Ernstoff & Chestnut, Seattle, Wash., for Lummi, Makah, Quileute and Suquamish Tribes.
Slade Gorton, Atty. Gen., James M. Johnson, Sr. Asst. Atty. Gen., Dennis D. Reynolds, Paul D. Solomon, Asst. Attys. Gen., Olympia, Wash., for defendant State of Washington.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECREE RE TREATY STATUS OF INTERVENOR DUWAMISH, SAMISH, SNOHOMISH, SNOQUALMIE AND STEILACOOM TRIBES
BOLDT, Senior District Judge.
This matter having come on regularly before the Court, and the Court having considered the Pretrial Order (PTO), the testimony and other evidence admitted and the memoranda and oral arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law in addition to those heretofore entered in this case, and on the basis thereof renders the following Decree:

FINDINGS OF FACT

General Findings
1. Article 2 of the Medicine Creek Treaty and Article 4 of the Point Elliott Treaty provided that the tribes and bands which were parties thereto agree to remove to and settle upon the reservations within one year after ratification of said treaties if the means were furnished them. In the years following the ratification of those treaties the United States did not enforce those provisions. A number of tribes or parts of tribes or bands which were parties to the treaties did not remove to the reservations and some Indians who did move later left the reservation, often returning to their native areas. Among the reasons for not removing to or remaining on the reservation were: (1) the reservations were too small or otherwise inadequate for the tribes and bands assigned to them; (2) the tribes or bands were not on friendly terms with others assigned to the reservation or with the people in whose territory the reservation was located; and (3) the reservation was too far from their traditional territory. The United States did not adopt or apply a *1103 policy of requiring the western Washington tribes or bands who were parties to the treaties to remove to or remain on the reservations. (PTO Part 2 ¶ 3)
(2). A number of individual Indian people intermarried with non-Indians, did not accompany their respective tribes to the reservations but took up the habits of non-Indian life, and lived as citizens of the State of Washington in non-Indian communities. (Ex. USA-112; Tr. 10/29/75, 378-379)
(3). During the latter part of the 19th century and early part of the 20th century it was the policy of the United States Government to encourage the breaking up of Indian reservations and destruction of tribal relations and to settle Indians upon their own allotments or homesteads, acculturate and incorporate them into the national life, and deal with them not as nations or tribes or bands but as individual citizens. (PTO Part 2 ¶ 4; Exs. USA-123 through 128; Annual Rept. Comm'r of Ind. Affairs, 1890, p. VI)
(4). This policy was officially changed in the 1930's. (Exs. USA-129 and 130) The Indian Reorganization Act of June 18, 1934, 48 Stat. 984, was directed at implementing a policy of organizing and strengthening Indian tribal entities so as to manage their own affairs and to promote their civic and cultural freedom and opportunity and their own economic rehabilitation. By the Indian Reorganization Act, the descendants of the treaty tribes associated with most of the reservations voted to reorganize pursuant to that Act as Indian tribes and political entities under federally-approved constitutions and bylaws having express and implied governmental and proprietary powers and with original inherent sovereign tribal powers preserved to the extent not restricted by federal law. Except for a brief policy in the 1950's of encouraging termination of federal supervision and administration of Indian affairs, the policy of encouraging tribal organization and greater self-management of internal affairs has continued and increased. (PTO Part 2 ¶ 4; Ex. USA-130 pp. 418-421; Tr. 12/6/74, 212-214)
(5). In the period around 1916-1919 the Bureau of Indian Affairs caused an enumeration and enrollment to be made of unattached Indians in western Washington arranged by families and tribes. Special Indian Agent Charles E. Roblin was assigned to make this enumeration and enrollment. He found that a large number of persons claiming enrollment and allotment as Indians were descendants of Indian women who married early non-Indian pioneers and founded families of mixed bloods. He reported that in many cases these applicants and families had never associated or affiliated with any Indian tribe for several decades or even generations. (Ex. USA-112)
(6). Neither Congress nor the Executive Branch has prescribed any standardized definition for either the term "Indian" or "Indian tribe" in terms of the special federal relationships with Indians. (Ex. USA-110, pp. 138-139) The term "Indian" is used in several contexts including biological descent, cultural identity and legal status. (Id.) The term "tribe" is most commonly used in two senses, an ethnological sense and a political sense although it also may be used in a social sense. (Federal Indian Law United States Department of the Interior (1958) p. 454)
(7). As a major aspect of the new federal Indian policy adopted in the 1930's Congress enacted the Indian Reorganization Act of 1934. One of its major purposes was to authorize and facilitate the reorganization and revitalization of Indian tribal political entities. (Ex. T-22; Exs. USA-129 and 130) While existing recognized tribes did not have to accept the Act, and many did not, it did provide a means by which tribes which had lost their political authority and recognition could regain it.
(8). The legislative history of the Indian Reorganization Act of 1934 shows that in determining who was to be considered an Indian for the purpose of such tribal reorganization Congress rejected the Department of the Interior's recommendation that persons who were not members of recognized tribes then under federal jurisdiction *1104 or their on-reservation descendants could participate in such reorganization if they were of one-fourth or more Indian blood. Instead Congress required that such persons be of one-half or more Indian blood. Representative Howard, the House sponsor and floor leader for the bill, explained during debate that the definition (now 25 U.S.C. § 479) defines who shall be classed as Indians for the purposes of the Act. He said:
"In essence, it recognizes the status quo of the present reservation Indians and further includes all other persons of one-fourth or more Indian blood. The latter provision is intended to prevent persons of less than one-fourth [later changed to one-half] Indian blood who are not already enrolled members of a tribe or descendants of such members living on a reservation from claiming the financial and other benefits of the act. Obviously the line must be drawn somewhere or the Government would take on impossible financial burdens in extending wardship over persons with a minor fraction of Indian blood." (Ex. T-22; Congressional Record, June 15, 1934, p. 12056)
(9). As used in (a) these Findings Nos. 1 to 59, inclusive, (b) in the Findings and Judgment awards of the Indian Claims Commission referred to in said Findings and in the requirements for the preparation of rolls for distribution of said Judgment awards, and (c) in the membership requirements of each of these Intervenor entities, the terms "descendant" or "persons of Indian blood" means any person whose lineage includes any ancestor who was an Indian or a member of the referenced Indian tribe, community or other group. This is also true of the term "persons of Indian blood" unless a particular minimum degree of such blood or descent is specifically prescribed.
(10). The Court of Claims has determined and held that the Indian Claims Act of 1946, 60 Stat. 1049, allows claims to be prosecuted under that Act on behalf of Indian tribes, bands or communities that have ceased to exist as such, if brought as a representative action on their behalf by a group whose members can be identified as members or descendants of members of a previously existing tribe. (Thompson v. United States, 122 Ct.Cl. 348 (1952))
(11). These five Intervenor tribes are not the beneficial owners of the Judgments that have been awarded under the Indian Claims Act on the claims prosecuted by them. Such Judgment Awards of the Intervenor Duwamish, Samish, Snohomish, and Snoqualmie tribes have been or will be distributed, pursuant to Acts of Congress dealing with such judgments, on a per capita basis to persons determined by the Secretary of the Interior to be descendants of members of the treaty-time tribes. (80 Stat. 910, 85 Stat. 83, 87 Stat. 466, 41 F.R. 5140) Distribution of the Steilacoom award has yet to be determined. (87 Stat. 466; Ex. USA-107, p. 4)
(12). None of the five Intervenor entities whose status is considered in these Findings is at this time a political continuation of or political successor in interest to any of the tribes or bands of Indians with whom the United States treated in the treaties of Medicine Creek and Point Elliott.

Specific Findings as to Intervenor Duwamish Tribe[1]
(13). The Intervenor Duwamish Tribe of Indians (herein referred to as the Intervenor Duwamish Tribe) is composed primarily of persons who are descendants in some degree of Indians who in 1855 were known as Dwamish Indians and who were party to the Treaty of Point Elliott, 12 Stat. 927. The 1855 Dwamish Indians were named in said treaty and four signatories were identified as signing for that tribe including the Suquamish chief, Seattle, who signed as chief of the Dwamish and Suquamish. (PTO Part 2 ¶¶ 1 & 2; Ex. USA-102 p. 23; Ex. USA-73 p. 9; Ex. G-17a pp. X-XXX-X-XXX) *1105 Estimates of the number of Dwamish at treaty time vary but Agent Paige reported 375 in November 1856, most of whom were on the Fort Kitsap (Port Madison) Reservation. (Ex. USA-102 pp. 4-5)
(14). Originally the Dwamish were intended to be settled on the Port Madison Reservation (aka Fort Kitsap) located in Suquamish territory. They objected to being moved there and recommendations of government officials for a separate reservation for them were not acted upon. (Ex. USA-102 pp. 3-12; Ex. G-17a pp. 5-118 5-125) Some of the Dwamish moved to the Port Madison, Muckleshoot or other reservations and some of their descendants now reside with and are members of those reservation communities. (Ex. USA-102 pp. 2, 4-5)
(15). The Intervenor Duwamish Tribe prosecuted a claim against the United States before the Indian Claims Commission in Docket No. 109 which resulted in a monetary judgment award. (Ex. G-17(a)) The Act of October 14, 1966, 80 Stat. 910; 25 U.S.C. §§ 1131-1135, provided for the Secretary of the Interior to prepare a roll of then living descendants of the Duwamish Tribe as it existed in 1855, and to distribute the funds so awarded to the persons on such roll. A judgment roll of 1166 persons was prepared for this purpose. (Tr. 10/29/75, 301; Tr. 10/30/75, 432)
(16). The Intervenor Duwamish Tribe exercises no attributes of sovereignty over its members or any territory. It is not recognized by the United States as an Indian governmental or political entity possessing any political powers of government over any individuals or territory. None of its organizational structure, governing documents, membership requirements or membership roll has been approved or recognized by the Congress or the Department of the Interior for purposes of administration of Indian affairs. (PTO Part 2 ¶ 2; Ex. USA-107) Said Intervenor has a constitution and bylaws and purports to operate as an identifiable and distinct entity on behalf of its members. (Ex. DU-19) It has, pursuant to said constitution and bylaws, a tribal council and a tribal chairman. The Intervenor tribe uses as a base for its membership the above-referenced judgment roll. (Tr. 12/18/74, 131-142; Tr. 10/29/75, 300-312) It has no current roll approved by the tribe but claims to be working on such a roll. (Tr. 10/29/75, 305-312)
(17). The Duwamish constitution requires members to be persons of Indian blood only, and descendant of the Duwamish Tribe. (Ex. DU-19) The tribe has consistently interpreted this as not requiring full-blood Indian (Tr. 10/29/75, 301), and most members are less than that. (Tr. 12/18/74, 131-132) The tribe has made no determination whether to exclude Canadians of Duwamish descent from membership. (Tr. 10/29/75, 304-305) About 50 to 60 persons pay yearly membership dues on a voluntary basis. (Tr. 12/18/74, 154)
(18). The members of the Intervenor Duwamish Tribe and their ancestors do not and have not lived as a continuous separate, distinct and cohesive Indian cultural or political community. Present members have no common bond of residence or association other than such association as is attributable to the fact of their voluntary affiliation with the Intervenor entity. (Ex. USA-115 secs. 1, 2(b), 7; Tr. 10/29/75, 319)
(19). The Intervenor Duwamish Tribe has had dealings with agencies of the United States, the State of Washington and local governments and with private organizations and Indian tribes, but said dealings were not different in substance from those engaged in by any social or business entity. (Exs. USA-107 pp. 5-7; and USA-115 sec. 1; Tr. 10/29/75, 313-317)
(20). The Intervenor Duwamish Tribe is not an entity that is descended from any of the tribal entities that were signatory to the Treaty of Point Elliott.
(21). The citizens comprising the Intervenor Duwamish Tribe have not maintained an organized tribal structure in a political sense.

Specific Findings as to Intervenor Samish Tribe
(22). The Intervenor Samish Indian Tribe (herein referred to as the Intervenor *1106 Samish Tribe) is composed primarily of persons who are descendants in some degree of Indians who in 1855 were known as Samish Indians and who were party to the Treaty of Point Elliott. The 1855 Samish were not named in the treaty but were assigned, for the purpose of including them in the treaty, to the Lummi signer, Chow-its-hoot, who signed the treaty for the Lummi and the other northern bands. (PTO Part 2 ¶¶ 1 and 2; Ex. USA-75 pp. 8-9) Official estimates of the number of Samish at treaty times varied from about 98 to about 150 persons. (Ex. USA-75 p. 13)
(23). Pursuant to the treaty most of the Samish people initially moved to the Lummi Reservation. Later others moved to the Swinomish Reservation. The present-day Lummi and Swinomish Reservation tribes include descendants of the 1855 Samish Indians. (Ex. USA-75 pp. 2, 14-16; Ex. USA-30; Ex. USA-74, pp. 3-4)
(24). The Intervenor Samish Tribe prosecuted a claim against the United States before the Indian Claims Commission in Docket No. 261 which resulted in a monetary judgment award. (Ex. USA-111) This award will be distributed per capita to the descendants of the Samish Tribe of Indians as it existed in 1859, born on or prior to and living on the effective date of the plan prepared by the Department of the Interior for the use and distribution of judgment funds. (41 F.R. 5140, Feb. 4, 1976)
(25). The Intervenor Samish Tribe exercises no attributes of sovereignty over its members or any territory. It is not recognized by the United States as an Indian governmental or political entity possessing any political powers of government over any individuals or territory. None of its organizational structure, governing documents, membership requirements nor membership roll has been approved or recognized by the Congress or the Department of the Interior for purposes of administration of Indian affairs. (PTO Part 2 ¶ 2) Said Intervenor has adopted a constitution and bylaws pursuant to which it has a tribal council and a tribal chairman and purports to operate as an identifiable and distinct entity on behalf of its members. It claims 549 members. (Ex. SA-M-2; Ex. SA-79)
(26). The Intervenor Samish Tribe's constitution provides that its membership shall consist of all persons of Indian blood whose names appear on the official membership roll of the Samish Tribe to be dated June 1, 1975, as prepared by the Secretary of the Interior, and all persons born to any member of the Samish Tribe. (Exs. SA-M-2 and SA-M-3; Tr. 10/29/75, 267) No such roll is now in existence. (Exs. USA-M-16 and USA-107, p. 3) There is no requirement of specific minimum blood quantum either as to Samish blood in particular or Indian blood in general. (Exs. SA-M-2 and SA-M-3; Tr. 10/29/75, 273-274) The Intervenor's membership roll contains 549 persons many of whom are of only 1/16th degree Indian blood. Two have only 1/32nd Samish blood. (Ex. SA-79) The tribe does not prohibit dual membership and at least one member is an officer of the Lummi Tribe. (Tr. 10/29/75, 273)
(27). The members of the Intervenor Samish Tribe and their ancestors do not and have not lived as a continuous separate, distinct and cohesive Indian cultural or political community. The present members have no common bond of residence or association other than such association as is attributable to the fact of their voluntary affiliation with the Intervenor entity. (Ex. USA-107; Tr. 10/29/75, 232-235)
(28). The Intervenor Samish Tribe has had dealings with agencies of the United States, the State of Washington, and local governments and with private organizations and Indian tribes, but said dealings were not different in substance from those engaged in by any social or business entity. (Ex. USA-107 pp. 5-7)
(29). The Intervenor Samish Tribe is not an entity that is descended from any of the tribal entities that were signatory to the Treaty of Point Elliott.
(30). The citizens comprising the Intervenor Samish Tribe have not maintained an organized tribal structure in a political sense.

*1107 Specific Findings as to Intervenor Snohomish Tribe

(31). The Intervenor Snohomish Tribe of Indians (herein referred to as the Intervenor Snohomish Tribe) is composed primarily of persons who are descendants in some degree of Indians who in 1855 were known as Snohomish Indians, who lived in the vicinity of the Snohomish River and tributary streams, and who were named in and were a party to the Treaty of Point Elliott. Ten signers were identified as Snohomish. According to George Gibbs' 1855 census, there were 441 Snohomish Indians. (PTO Part 2 ¶¶ 1 and 2; Ex. USA-103, pp. 1-3)
(32). The Snohomish Reservation described in the treaty (later absorbed into the larger Tulalip Reservation) was intended for the Snohomish and other Indians and the majority of the members of the Tulalip Tribes are of Snohomish ancestry. However, a large number of Snohomish descendants did not become members of the Tulalip Reservation community. (Ex. USA-103, pp. 6, 12; Tr. 10/29/75, 396)
(33). The Intervenor Snohomish Tribe prosecuted a claim against the United States before the Indian Claims Commission in Docket No. 125 which resulted in the award of a monetary judgment. (Ex. G-17n; T-1) By the Act of June 23, 1971, 85 Stat. 83, Congress directed the Secretary of the Interior to prepare a roll of all persons then living who were lineal descendants of members of the Snohomish Tribe as it was constituted in 1855, other than persons who had shared or were eligible to share in a per capita distribution of a judgment against the United States recovered by any other tribe. The act directed that the Snohomish judgment be distributed per capita to the persons on said roll. Such a roll is now being prepared. (Ex. USA-107, p. 3)
(34). The Snohomish constitution requires members to be persons of Snohomish Indian blood whose names appear on the Roblin schedule of unenrolled Indians, or persons of Indian blood whose names appear on the Snohomish membership rolls, or children born to any member of the Snohomish Tribe. There is no requirement of specific minimum blood quantum either as to Snohomish blood in particular or Indian blood in general. (Ex. SNH-M-10; Tr. 12/18/74, 32-35)
(35). The Intervenor Snohomish Tribe exercises no attributes of sovereignty over its members or any territory. It is not recognized by the United States as an Indian governmental or political entity possessing any political powers of government over any individuals or territory. None of its organizational structure, governing documents, membership requirements or membership roll has been approved or recognized by the Congress or the Department of the Interior for purposes of administration of Indian affairs. (PTO Part 2 ¶ 2) Said Intervenor is organized as a corporate entity under Washington state law with a constitution and articles of incorporation and bylaws filed with the State of Washington as a nonprofit corporation and purports to operate as an identifiable and distinct entity on behalf of its members. (Exs. SNH-M-10 and SNH-M-11; Ex. T-M-5) It has, pursuant to such constitution and bylaws, a tribal council and a tribal chairman. It claims 720 members. (Ex. SNH-53)
(36). The members of the Intervenor Snohomish Tribe and their ancestors do not and have not lived as a continuous separate, distinct and cohesive Indian cultural or political community. The present members have no common bond of residence or association other than such association as is attributable to the fact of their voluntary affiliation with the Intervenor entity. (Tr. 10/29/75, pp. 378-379, 385-386)
(37). The Intervenor Snohomish Tribe has had dealings with agencies of the United States, the State of Washington and local governments and with private organizations and Indian tribes, but said dealings were not different in substance from those engaged in by any social or business entity. (Ex. USA-107, pp. 5-7)
(38). The Intervenor Snohomish Tribe is not an entity that is descended from any of the tribal entities that were signatory to the Treaty of Point Elliott.
*1108 (39). The citizens comprising the Intervenor Snohomish Tribe have not maintained an organized tribal structure in a political sense.

Specific Findings as to Intervenor Snoqualmie Tribe
(40). The Intervenor Snoqualmie Tribal Organization (herein referred to as the Intervenor Snoqualmie Tribe) is composed primarily of persons who are descendants in some degree of Indians who in 1855 were known as Snoqualmoo Indians and of other bands of Indians who resided in the general vicinity of the Snoqualmie River. The Snoqualmoo were named in and a party to the Treaty of Point Elliott. Fourteen signers of the treaty were identified as Snoqualmoo, including their chief, Patkanim. (PTO Part 2 ¶¶ 1 & 2; Ex. USA-104 pp. 30-33) There are conflicting reports on the number of Snoqualmoo at treaty times but estimates in the neighborhood of 300-400 were made in both the 1850's and 1870. (Ex. G-17o pp. 291-295; Ex. USA-104 pp. 4-6, 9-10)
(41). The Snohomish Bay Reservation described in the treaty (later absorbed into the Tulalip Reservation) was intended for the Snoqualmie Indians whom the treaty negotiators included with the Snohomish. (Ex. USA-104 p. 4) Some of the Snoqualmie Indians settled on the Tulalip Reservation and many of their descendants are members of the Tulalip Tribes. Some were officially enrolled as members of other Indian reservation communities. But most remained off reservation. (Ex. USA-104 pp. 2, 8; Ex. USA-113) Periodically from as early as 1856 to as recently as the 1940's local Bureau of Indian Affairs officials recommended the establishment of a reservation for some of the latter but the recommendations were not acted upon. (Ex. USA-104 pp. 2, 4; Ex. USA-118 p. 65)
(42). The Intervenor Snoqualmie Tribe on its own behalf and on relation of the Skykomish Tribe prosecuted a claim against the United States before the Indian Claims Commission in Docket No. 93 which resulted in a monetary judgment award. (Ex. G-17o; Ex. T-2) By the Act of June 23, 1971, 85 Stat. 83, Congress directed the Secretary of the Interior to prepare a roll of all persons then living who were lineal descendants of members of the Snoqualmie and Skykomish Tribes as they were constituted in 1855. (Ex. USA-M-17) The Act directed that the Snoqualmie-Skykomish judgment be distributed per capita to the persons on such roll. Such a roll is now being prepared. (Tr. 10/30/75, 431)
(43). The Snoqualmie constitution provides that any person with 1/8th degree or more of Snoqualmie Indian blood is accepted for membership. (Ex. SNQ-1; Ex. SNQ-2) The group's roll was not discussed with BIA. (Tr. 10/28/75, 134) As a result they included some people who were enrolled in another nontreaty tribe (Tr. 10/28/75, 146) and some who are not carried on the Government's rolls as Snoqualmie. (Ex. USA-108, pp. 131, 132 and 133; Tr. 10/30/75, 411-419)
(44). In 1953 the BIA reported to Congress that the Snoqualmie Indian Tribe:
". . . was not formulated for self-government as members of this band are widely scattered and live in non-Indian communities and are independent and well aware of responsibilities for their own welfare." (Ex. USA-114 p. 1)
(45). The Intervenor Snoqualmie Tribe exercises no attributes of sovereignty over its members or any territory. It is not recognized by the United States as an Indian governmental or political entity possessing any political powers of government over any individuals or territory. None of its organizational structure, governing documents, membership requirements nor membership roll has been approved or recognized by the Congress or the Department of the Interior for purposes of administration of Indian affairs. (PTO Part 2 ¶ 2; Ex. USA-107; Ex. SNQ-7) Said Intervenor has a constitution and bylaws and purports to operate as an identifiable and distinct entity on behalf of its members. (Ex. SNQ-1) It has, pursuant to said constitution and bylaws, a tribal council and a tribal chairman. It lists 284 persons on its proposed roll. (Ex. SNQ-2)
*1109 (46). The Intervenor Snoqualmie Tribe has had dealings with agencies of the United States, the State of Washington and local governments and with private organizations and Indian tribes, but said dealings were not different in substance from those engaged in by any social or business entity. (Ex. USA-107; Ex. SNQ-7)
(47). The members of the Intervenor Snoqualmie Tribe and their ancestors do not and have not lived as a continuous separate, distinct and cohesive Indian cultural or political community. The present members have no common bond of residence or association other than such association as is attributable to the fact of their voluntary affiliation with the Intervenor entity. (Tr. 10/28/75 p. 111; Tr. 12/6/74 p. 219)
(48). The Intervenor Snoqualmie Tribe is not an entity that is descended from any of the tribal entities that were signatory to the Treaty of Point Elliott.
(49). The citizens comprising the Intervenor Snoqualmie Tribe have not maintained an organized tribal structure in a political sense.

Specific Findings as to Intervenor Steilacoom Tribe
(50). The Intervenor Steilacoom Tribe of Indians (herein referred to as the Intervenor Steilacoom Tribe) is composed primarily of persons who are descendants in some degree of Indians who in 1854 were known as Steilacoom or Steilakumahmish Indians, who lived on the southern shore of Puget Sound opposite Fox, McNeil, Anderson and Ketron Islands in the general vicinity of what is now the town of Steilacoom, and who were named in and a party to the Treaty of Medicine Creek. (10 Stat. 1132) (PTO Part 2 ¶¶ 1 & 2; Ex. USA-105 pp. 1, 8) S. S. Ford, Jr., who was in charge of the temporary Fox Island Reservation, reported that 120 Steilacoom Indians were on the reservation in May 1856. (Ex. USA-105 pp. 3-4)
(51). After the temporary Fox Island Reservation was abandoned some of the Steilacoom people removed to the Nisqually Reservation, some to the Puyallup Reservation and some evidently returned to their traditional homes. (Ex. USA-105 pp. 6, 10) Some may also be enrolled as Muckleshoot Indians. (Ex. USA-119 p. 1) Present members of the Intervenor Steilacoom Tribe trace descent from a relatively small number of families who were resident in the Steilacoom area in 1854. (Ex. USA-105 p. 7)
(52). In 1937 the Superintendent of the Taholah Agency reported that the Steilacoom Indians "have functioned as a tribal group only for the purpose of filing a petition in the Court of Claims . . . ." (Ex. USA-119 p. 1)
(53). The Intervenor Steilacoom Tribe prosecuted a claim against the United States before the Indian Claims Commission in Docket No. 208 which resulted in a monetary judgment award that has been appealed by the tribe. (Ex. G-17(j)) After the appeal has been resolved, the use or distribution of any finally awarded funds will be determined under the provisions of the Act of October 19, 1973, 87 Stat. 466. (Ex. USA-107 p. 4)
(54). The Intervenor Steilacoom Tribe exercises no attributes of sovereignty over its members or any territory. It is not recognized by the United States as an Indian governmental or political entity possessing any political powers of government over any individuals or territory. None of its organizational structure, governing documents, membership requirements or membership roll has been approved or recognized by the Congress or the Department of the Interior for purposes of administration of Indian affairs. (PTO Part 2 ¶ 2; Ex. USA-107) Said Intervenor tribe presently operates as an identifiable and distinct entity on behalf of its members under a constitution and bylaws recently adopted by its members to replace earlier such documents. (Ex. SC-8; Ex. SC-35 pp. 2-3; Tr. 10/28/75 pp. 171-172) Pursuant to said constitution it has a tribal council and a tribal chairman. Membership consists of (a) all children born to any "enrolled member of the Steilacoom Tribe", (b) all persons *1110 of Steilacoom Indian blood "whose names appear on the membership rolls of the Steilacoom Tribe before adoption of this [1975] constitution", (c) all persons of Steilacoom Indian blood whose names appear on the Roblin Schedule of Unenrolled Indians, and (d) all descendants of persons of Indian ancestry. Except for the Roblin Schedule, none of these rolls was prepared or approved by the Secretary of the Interior. No specific minimum blood quantum is required and a number of members are no more than 1/8th degree Steilacoom blood. (Ex. SC-8 pp. 1-2; Ex. USA-108; Ex. USA-109) It presently claims 359 members, of whom 73 are adopted members. The others trace their descent from nine Steilacoom families. (Ex. SC-6) Most but not all of the adopted members claim some ancestry from Indians who were members of tribes or bands that were parties to the Treaty of Medicine Creek. (Ex. SC-6) BIA has not been consulted in the preparation of the tribe's membership roll. (Tr. 10/28/75, 163, 196)
(55). The members of the Intervenor Steilacoom Tribe and their ancestors do not and have not lived as a continuous separate, distinct and cohesive Indian cultural or political community. The present members have no common bond of residence or association other than such association as is attributable to the fact of their voluntary affiliation with the Intervenor entity. (Ex. USA-107; Tr. 12/6/74, 219)
(56). The Intervenor Steilacoom Tribe has had dealings with agencies of the United States, the State of Washington and local governments and with private organizations and Indian tribes, but said dealings were not different in substance from those engaged in by any social or business entity. (Ex. USA-107)
(57). Significant numbers of the members of the Intervenor Steilacoom Tribe are not descended from the Steilacoom or other Indians who were parties to the Treaty of Medicine Creek.
(58). The Intervenor Steilacoom Tribe is not an entity that is descended from any of the tribal entities that were signatory to the Treaty of Medicine Creek.
(59). The citizens comprising the Intervenor Steilacoom Tribe have not maintained an organized tribal structure in a political sense.

CONCLUSIONS OF LAW
(1). The fishing rights secured by the treaties of Medicine Creek and Point Elliott are communal rights which belong to the Indians with whom the treaties were made in their collective sovereign capacity. Being communal in nature these rights are not inheritable or assignable by the individual member to any person, party or other entity of any kind whatsoever. They are held today for the use and benefit of the persons who continue to maintain a tribal structure exercising governmental or political powers.
(2). In determining whether a group of persons have maintained Indian tribal relations and a tribal structure sufficient to constitute them an Indian tribe having a continuing special political relationship with the United States, the extent to which the group's members are persons of Indian ancestry who live and were brought up in an Indian society or community, the extent of Indian governmental control over their lives and activities, the extent and nature of the members' participation in tribal affairs, the extent to which the group exercises political control over a specific territory, the historical continuity of the foregoing factors, and the extent of express acknowledgement of such political status by those federal authorities clothed with the power and duty to prescribe or administer the special political relationships between the United States and Indians are all relevant factors to be considered.
(3). By the Stevens treaties and by other actions of the United States, the Indian tribes which were parties to said treaties, and their members, came under the jurisdiction of the United States, and the determination of what entities may exercise political control over communal rights secured by treaties with respect to the taking *1111 of fish and other wildlife is a political question requiring determination or concurrence by the political authorities of the United States.
(4). Only tribes recognized as Indian political bodies by the United States may possess and exercise the tribal fishing rights secured and protected by the treaties of the United States.
(5). Federal jurisdiction to authorize or secure immunities from state fish and game laws otherwise applicable to citizens or persons within the state, relevant to this proceeding, is derived solely from the Federal Government's plenary powers with respect to Indian affairs. The jurisdiction does not exist except with respect to persons or entities which are "Indians" or "Indian Tribes," respectively, in the political sense as acknowledged by the United States.
(6). None of the Intervenor entities, Duwamish, Samish, Snohomish, Snoqualmie, and Steilacoom Tribes herein, is at this time a treaty tribe in the political sense within the meaning of Final Decision No. I and the related Orders of the Court in this case.
(7). None of the Intervenor entities, Duwamish, Samish, Snohomish, Snoqualmie, and Steilacoom Tribes herein, presently holds for itself or its members fishing rights secured by any of the Stevens treaties identified in Final Decision No. 1 in this case.

DECREE
Based on the above Findings of Fact and Conclusions of Law, it is hereby adjudged and decreed that the Intervenor entities, Duwamish, Samish, Snohomish, Snoqualmie, and Steilacoom Tribes, do not have and may not confer upon their members fishing rights under the Treaties of Point Elliott and Medicine Creek.
NOTES
[1] The use of the word "tribe" in identifying each of the Intervenors herein does not constitute a Finding or Conclusion that such Intervenor is presently an Indian tribe in either the political or the ethnological sense except where a Finding or Conclusion is specifically addressed to that issue.