98 F.3d 1159
 65 USLW 2297, 36 Fed.R.Serv.3d 66, 96
Cal. Daily Op. Serv. 7792,
96 Daily Journal D.A.R. 12,887
 UNITED STATES of America, Plaintiff-Appellee,
and
Duwamish Indian Tribe; Snohomish Indian Tribe; Steilacoom
Indian Tribe, Plaintiffs-Intervenors-Appellants,
v.
STATE OF WASHINGTON; Nisqually Indian Tribe; Hoh Indian
Tribe; Lummi Indian Nation; Skokomish Indian Tribe;
Jamestown Band of Klallams; Lower Elwha Klallam Tribe;
Port Gamble Band Clallam; Muckleshoot Indian Tribe;
Quinault Indian Nation; Quileute Indian Tribe; Tulalip
Tribe; Makah Indian Tribe; Suquamish Indian Tribe;
Puyallup Tribe; Swinomish Indian Tribal Community;
Nooksack Tribe; Upper Skagit Tribe, Defendants-Appellees.
 No. 95-35202.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 5, 1995.
Decided Oct. 23, 1996.
 
 Tim Atkeson, Arnold & Porter, Denver, CO; Dennis J. Whittlesey, Venable, Baetjer, Howard & Civiletti, Washington, DC, for plaintiffs-intervenors-appellants.
 David C. Shilton, United States Department of Justice, Environment & Natural Resources Division, Washington, DC, for plaintiff-appellee.
 Fronda Woods, Assistant Attorney General, Fish and Wildlife, Olympia, WA; Mason D. Morisset, Morisset, Schlosser, Ayer & Jozwiak, Seattle, WA; Annette Marie Klapstein, Tacoma, WA; Jeffrey Jon Bode, Bellingham, WA; Richard M. Berley, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, WA; Kathryn J. Nelson, Eisenhower & Carlson, Tacoma, WA; Robert L. Otsea, Jr., Auburn, WA; Sharon Ilene Haensly, Office of the Tribal Attorney, LaConner, WA; Harold Chesnin, Mathews, Garlington-Mathews & Chesnin, Seattle, WA; Daniel A. Raas, Raas, Johnsen & Stuen, Bellingham, WA, for defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington, Barbara J. Rothstein, District Judge, Presiding. D.C. No. CV-70-09213-BJR.
 Before: FLETCHER, KOZINSKI and LEAVY, Circuit Judges.
 Opinion by Judge LEAVY; Concurrence by Judge KOZINSKI.
 LEAVY, Circuit Judge:
 
 
 1
 In 1979, United States District Judge George H. Boldt ruled that five Northwest Indian tribes had no treaty fishing rights. In 1993, three of these tribes, the Duwamish, Snohomish, and Steilacoom Tribes ("the Three Tribes"), petitioned the United States District Court for Western Washington for relief from the 1979 judgment pursuant to Federal Rule of Civil Procedure 60(b)(6) on the ground that Judge Boldt may have suffered from Alzheimer's disease in 1979. The United States, the State of Washington, and most tribes with treaty fishing rights[1] opposed the Three Tribes' motion. On January 23, 1995, the district court denied the motion and the Three Tribes timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.
 
 FACTS AND PRIOR PROCEEDINGS
 
 2
 In 1970, the United States in its capacity as trustee for seven Indian tribes brought this action against the State of Washington to enforce the Stevens Treaties, which concern Indian fishing rights.[2] Seven other tribes intervened as plaintiffs. In 1974, Judge Boldt ruled that all fourteen tribes had treaty fishing rights which entitled them to take up to fifty percent of the harvestable fish passing through their off-reservation fishing grounds. United States v. Washington, 384 F.Supp. 312.[3]
 
 
 3
 After Judge Boldt's 1974 decision, five additional tribes moved to intervene as plaintiffs in United States v. Washington: the Duwamish, Snohomish, Steilacoom, Snoqualmie, and Samish ("the Five Tribes"). On September 13, 1974, Judge Boldt referred the issue of the treaty status of these Five Tribes to Magistrate Judge Robert E. Cooper. Magistrate Judge Cooper held hearings and received evidence on whether the Five Tribes had treaty fishing rights. On March 5, 1975, Magistrate Judge Cooper issued a Report finding that none of the Five Tribes had maintained their political cohesion, and thus recommending a conclusion of law that none had rights under the Stevens Treaties. After appeal by the Five Tribes from the magistrate judge's report, Judge Boldt held a three-day de novo evidentiary hearing later in 1975, directed the parties to submit additional evidence in 1976, and heard oral argument in 1977.
 
 
 4
 In February 1978, before issuing a decision, Judge Boldt underwent surgery for an aortic aneurysm. By letter dated July 25, 1978, Judge Boldt informed all counsel involved in the pending case that, although he was making "very good progress" in recovering from surgery, he was not fully recovered. He stated his intent to rule on the status of the Five Tribes within the next several months.
 
 
 5
 However, on February 7, 1979, Judge Boldt notified all counsel that, in light of his health, he had asked then Chief Judge Walter T. McGovern to remove him from the case. The Samish, Snoqualmie, Snohomish, and Steilacoom tribes filed a motion on February 15, 1979, in which they requested that Judge Boldt decide whether they qualified as treaty tribes with respect to fishing rights. In an order dated March 14, 1979, Chief Judge McGovern granted the tribes' motion on the grounds that it was "in the best interests of judicial administration and economy, and in the interest of all parties." In a footnote, Judge McGovern stated that "[t]he court has been informed that Judge Boldt is willing, if requested, to consider and issue a ruling on this matter."
 
 
 6
 Nine days later, on March 23, 1979, Judge Boldt ruled that the Five Tribes had no rights under the Stevens Treaties. United States v. Washington, 476 F.Supp. 1101 (W.D.Wash.1979), aff'd, 641 F.2d 1368 (9th Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982). In doing so he adopted with minor changes the proposed findings of fact and conclusions of law submitted by the United States. On April 25, 1979, Judge Boldt denied the tribes' motion for reconsideration.
 
 
 7
 The Five Tribes appealed to this court, which, in a split decision, affirmed Judge Boldt. 641 F.2d at 1374. Because Judge Boldt adopted the proposed findings of the United States, his decision was given "close scrutiny." Id. at 1371. This court concluded that Judge Boldt had applied an incorrect legal test (i.e., that federal recognition or nonrecognition was decisive) to determine whether a tribe had treaty rights. The proper inquiry was whether a "group of Indian descendants ... have maintained an organized tribal structure." Id. at 1372. Applying the correct test directly to the record, this court concluded "[a]fter close scrutiny, ... that the evidence supported [Judge Boldt's] finding of fact" that the tribes had not functioned since treaty times as "continuous separate, distinct and cohesive Indian cultural or political communit[ies]." Id. at 1373. This court affirmed Judge Boldt because "the district court correctly resolved this question despite its failure to apply the proper standard." Id. at 1374.
 
 
 8
 The United States Supreme Court subsequently denied the tribes' petition for certiorari. 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982).
 
 
 9
 Judge Boldt died in 1984.
 
 
 10
 On June 11, 1992, the Seattle Post-Intelligencer published a front-page article, "Alzheimer's Strikes Indians Through Judge," which reported that, at the time of his 1979 ruling, Judge Boldt suffered from Alzheimer's disease. Paul Shukovsky, Alzheimer's Strikes Indians Through Judge, Seattle Post-Intelligencer, June 11, 1992, at A1, A6. The article was based, in part, on Judge Boldt's death certificate which lists pneumonia as the immediate cause of death and Alzheimer's disease as a secondary cause. According to the death certificate, the Alzheimer's set in during 1978. In the newspaper article, Judge Boldt's son is quoted concerning his father's medical condition:
 
 
 11
 "He was so bright, so sharp, so articulate all his life until February of 1978," his son said. "He was a different man afterwards. He went into a state of deterioration. He went into a six year decline" that ended with his death in 1984.
 
 
 12
 "He started to develop a lot of the symptoms of Alzheimer's and continued to have them," his son said.
 
 
 13
 Judge Boldt's son also stated in the article that he believed his father to have been mentally competent when he ruled against the tribes in 1979: "He loved the law." "He would not do anything to violate his duties as a judge."
 
 
 14
 On November 22, 1993, the Three Tribes filed a motion in the United States District Court for Western Washington for relief from Judge Boldt's 1979 judgment pursuant to Rule 60(b)(6). At oral argument on the motion, held on November 11, 1994, almost a year after the motion was filed, the Three Tribes argued that their motion was for the limited purpose of conducting discovery into the state of Judge Boldt's mental health at the time he rendered his 1979 decision. The record does not indicate that the Three Tribes moved for discovery during oral argument or in the year that elapsed between the time they filed their Rule 60(b)(6) motion and their oral argument.
 
 
 15
 On January 23, 1995, Judge Barbara J. Rothstein, without deciding whether the broad language of Rule 60(b)(6) provided a remedy in case of a judge's disability, denied the Three Tribes' motion. The district court noted that 15 years had passed since Judge Boldt's decision, but "decline[d] to deny the tribes' motion on this ground alone." Instead, the court rested its denial on three foundations. First, courts should avoid disturbing the public interest in the finality of judgments. Second, a ruling for the Three Tribes would open the floodgates to future challenges to judgments on grounds of judicial incompetence. Third, the Three Tribes suffered no "manifest injustice" because the magistrate judge and the Ninth Circuit reached the same conclusion as Judge Boldt. The district court concluded that "the moving tribes have failed to demonstrate the existence of any extraordinary circumstances which would warrant reopening the final order of March 23, 1979 for the purpose of conducting discovery into Judge Boldt's mental health. Their [60(b)(6) ] motion is accordingly denied." The Three Tribes timely appeal.
 
 STANDARD OF REVIEW
 
 16
 This court reviews a district court's denial of a Rule 60(b) motion for an abuse of discretion. In re Roxford Foods, Inc., 12 F.3d 875, 879 (9th Cir.1993). Under the abuse of discretion standard, a reviewing court may not reverse unless it has a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of the relevant factors. A district court may abuse its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of material fact." Kayes v. Pacific Lumber Co., 51 F.3d 1449, 1464 (9th Cir.) (quotations and citations omitted), cert. denied, --- U.S. ----, 116 S.Ct. 301, 133 L.Ed.2d 206 (1995).
 
 ANALYSIS
 
 17
 Rule 60(b) provides in relevant part: "On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons: ... (6) any other reason justifying relief from the operation of the judgment." Fed.R.Civ.P. 60(b)(6).
 
 
 18
 [Rule 60(b)(6) ] does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority "adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice," Klapprott v. United States, 335 U.S. 601, 614-15, 69 S.Ct. 384, 390, 93 L.Ed. 266 (1949), while also cautioning that it should only be applied in "extraordinary circumstances," Ackermann v. United States, 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 (1950). Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863-64, 108 S.Ct. 2194, 2204, 100 L.Ed.2d 855 (1988).
 
 
 19
 Following the admonitions of the Supreme Court, we have used Rule 60(b)(6) "sparingly as an equitable remedy to prevent manifest injustice." United States v. Alpine Land & Reservoir Co., 984 F.2d 1047, 1049 (9th Cir.), cert. denied, 510 U.S. 813, 114 S.Ct. 60, 126 L.Ed.2d 29 (1993). "The rule is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment." Id.
 
 
 20
 The Three Tribes argue that 60(b)(6) relief should be granted and discovery allowed because of the possibility that they were denied a competent fact-finder when their treaty status was decided by Judge Boldt. This is not one of those rare cases where "extraordinary circumstances" warrant vacating an "erroneous judgment." The Three Tribes offer only Judge Boldt's death certificate and the Seattle Post-Intelligencer Article to support their contention that Judge Boldt may have suffered some mental impairment in 1979. The death certificate states that Judge Boldt was diagnosed with Alzheimer's sometime in 1978. In the newspaper article Judge Boldt's son says that his father was a changed man after his 1978 surgery, but that he was mentally competent when he decided the tribes' treaty status. The correspondence from Judge Boldt shows that the judge knew his surgery had physically weakened him and that he also knew of his obligation to decide the tribes' treaty status. When he felt unable to fulfill his commitment to decide the tribes' status "within the next several months," he asked Chief Judge McGovern to remove him from the case. The tribes responded by requesting that Judge Boldt rule on their status before stepping down. Chief Judge McGovern allowed their motion and Judge Boldt ruled. We should not reopen a judgment under these circumstances. Moreover, this court, as well as a magistrate judge, closely examined the case and reached the same conclusion as Judge Boldt. A decision on the issue of whether Rule 60(b)(6) gives the district court the power to correct a manifest injustice arising from a judge's disability should await the extraordinary circumstances in which it might be presented. The district court did not abuse its discretion in denying the Three Tribes' motion to reopen the judgment and allow discovery.
 
 
 21
 The district court's denial of the Three Tribes' motion is AFFIRMED.
 
 KOZINSKI, Circuit Judge, concurring:
 
 22
 The majority holds that "[t]he district court did not abuse its discretion in denying the ... Tribes' [Rule 60(b) ] motion to reopen the judgment and allow discovery." Maj. op. at 10. In this my colleagues err twice. Their first error is assuming that 60(b) applies to this situation at all and, therefore, that the court had discretion to deny or grant relief. In fact, the district court could have granted the Tribes no relief, even had they shown conclusively that Judge Boldt was mentally impaired when he rendered judgment against them. The second error derives from the first: Having presumed that Rule 60(b) applies, the majority holds that plaintiffs did not make a showing sufficient to warrant discovery into Judge Boldt's disability. But it seems to me plaintiffs have made a more-than-sufficient showing to justify discovery, were 60(b) applicable.
 
 
 23
 This is one time when two wrongs do make a right, which is why I am concurring rather than dissenting. But the majority, I fear, leaves misleading tracks in the sand for other courts and litigants to follow.
 
 
 24
 1. I start with the proposition that Rule 60(b) is only a time-shifting provision; it does not confer independent authority on federal courts to set aside past judgments. Or, to put it differently, Rule 60(b) authorizes setting aside a judgment only for reasons that would have prevented entry of the judgment in the first place, had the reasons been known at the time judgment was entered. In deciding whether the district court was authorized to grant the Tribes relief, we must therefore answer the following question: Would Judge Boldt's disability (had it been known at the time he ruled against the Tribes) have been grounds for securing his recusal, or for reversing his judgment on appeal?
 
 
 25
 The answer is no. Under 28 U.S.C. §§ 144 or 455, a party may petition a judge to remove himself from a case in which he has a financial conflict of interest. See 13A Charles A. Wright et al., Federal Practice and Procedure § 3550 (1984); 7A Federal Procedure L.Ed. § 20:47-54 (Thomas T. Trenkner et al. eds., 1992); Liljeberg v. Health Services Acquis. Corp., 486 U.S. 847, 863-70, 108 S.Ct. 2194, 2204-08, 100 L.Ed.2d 855 (1988). A judge's failure to recuse himself can also be raised on direct appeal, see, e.g., Yagman v. Republic Ins., 987 F.2d 622, 626-27 (9th Cir.1993), or by petition for mandamus. In re Cement Antitrust Litigation (MDL No. 296), 673 F.2d 1020, 1025 (9th Cir.1982). If the conflict of interest is disclosed only after the judgment becomes final, the judgment can be set aside under Rule 60(b)(6). Liljeberg, 486 U.S. at 863, 108 S.Ct. at 2204.
 
 
 26
 A party can force a judge to recuse himself in such circumstances because financial conflict is an enumerated ground for disqualification under section 455. There are other grounds for disqualification in sections 144 and 455, such as bias, prejudice and personal knowledge of disputed evidentiary facts. See generally Richard E. Flamm, Judicial Disqualification: Recusal and Disqualification of Judges (1996). But a litigant who would force a judge to disqualify himself must point to some statutory ground for recusal; there is no residual common law authority for judicial disqualification. See, e.g., Sinito v. United States, 750 F.2d 512 (6th Cir.1984) (claim that judge was assigned to case in violation of court's random draw policy not a basis for disqualification).
 
 
 27
 Disability, mental or physical, is not one of the grounds enumerated in sections 144, 455 or any other statute; it is, therefore, not a proper basis for seeking a judge's recusal. The only recourse when a judge is believed to be disabled is to complain to the circuit judicial council. See 28 U.S.C. § 372(c). If the council, after investigation, finds the judge unfit to serve, it may request that he voluntarily retire, order that no further cases be assigned to him temporarily or take "such other action as it considers appropriate." 28 U.S.C. § 372(c)(6)(B).[1] Unlike a motion to recuse under sections 144 or 455, which is raised in the particular case where the conflict arises, a section 372(c) complaint is handled as a separate, quasi-adjudicative proceeding.[2]
 
 
 28
 As my colleagues may recall, section 372 was passed in response to the problem posed by an Article III judge who was thought unfit to serve but could not be removed because he had not committed an impeachable offense. See Chandler v. Judicial Council of the Tenth Circuit, 398 U.S. 74, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970); H.R.Rep. No. 1313, 96th Cong., 2d Sess. 12 (1980) U.S.Code Cong. & Admin.News 4315, 4325-4326 ("An illustration of the type of complaint that might be referred directly to the Judicial Conference [under the House version of the Act] ... could involve circumstances like those existing in Chandler v. United States."); Judicial Tenure and Discipline 1979-80: Hearings Before the Subcomm. on Courts, Civil Liberties and the Administration of Justice of the House of Representatives Comm. on the Judiciary, 96th Cong., 1st & 2d Sess. 27, 39, 45, 82-83, 107-08, 111, 114 (1979-80) (discussing Chandler ). In dealing with the problem, Congress was aware of the Article III implications of removing a judge from further service by means short of impeachment. See Chandler, 398 U.S. at 136, 90 S.Ct. at 1680 ("What the Judicial Council did when it ordered petitioner to 'take no action whatsoever in any case or proceeding now or hereafter pending' in his court was to do what only the Court of Impeachment can do.") (Douglas, J., joined by Black, J., dissenting). Section 372 was, for that reason, highly controversial and viewed by some as an unconstitutional encroachment on Article III independence. See S.Rep. No. 362, 96th Cong., 2d Sess. 21 (1979), reprinted in 1980 U.S.C.C.A.N. 4315, 4334 ("[T]he Judiciary was given no power [by the Constitution], either express or implied, to police its own members.") (additional Views of Senator Howell Heflin); id. at 27 ("[The Judicial Conduct and Disability Act] would pose a direct and serious threat to the time-honored and constitutionally enshrined principle of judicial independence.") (additional Views of Senator Charles McC. Mathias, Jr.); id. at 29 ("I believe [the Judicial Conduct and Disability Act] will chill the independence of the Federal Judiciary ....") (additional Views of Senator Paul Laxalt). See also Frank J. Battisti [Chief Judge, United States District Court, Northern District of Ohio], An Independent Judiciary or an Evanescent Dream, 25 Case W. Res. L.Rev. 711, 714-15 (1975) (arguing that the "vague and overbroad language of the section ... present[s] a significant threat to the independence of the federal judiciary."); Lynn A. Baker, Note, Unnecessary and Improper: The Judicial Councils Reform and Judicial Conduct and Disability Act of 1980, 94 Yale L.J. 1117, 1141 (1985) (blaming congressional "impatience" for "alluring [but] unconstitutional" Act).
 
 
 29
 Section 372 reflects a carefully crafted compromise between maintaining Article III independence and ensuring a competent judiciary. In striking this balance, Congress gave the judicial councils, not the courts of appeals, the power to remove disabled judges. The judicial councils, composed as they are of district and circuit judges, see 28 U.S.C. § 332(a)(1), are far better suited to deal with the delicate problem of judicial disability than are panels of the courts of appeals. For appellate judges, sitting in a particular case, to disqualify a district judge because they believe him unfit to serve would upset the balance embodied in section 372 and exceed the authority conferred by sections 144 and 455. The Tribes thus could not have forced Judge Boldt's recusal had they been aware of his disability while he was presiding over their case. It follows, a fortiori, that his judgment cannot be set aside on this basis years later under Rule 60(b).[3]
 
 
 30
 2. The majority's second--offsetting--error concerns the availability of discovery under Rule 60(b). Because I do not believe 60(b) applies here at all, this portion of the opinion is irrelevant to my analysis. Nevertheless, I am concerned that the majority makes some bad law in this area. The majority holds that the district judge did not abuse her discretion in denying the Tribes discovery into Judge Boldt's mental health at the time he rendered his judgment. But, were mental disability a proper basis for setting aside the judgment, plaintiffs would have made a sufficient showing.
 
 
 31
 By way of analogy, imagine a newspaper report that Judge X secretly owned stock in a corporation that was a party before him some years ago. And imagine that the article reveals the name of a broker who maintained the judge's clandestine account. Surely the losing party would be entitled to obtain discovery from the broker to help figure out whether the judge had a financial stake in the outcome of the case. This is because the judge's stock ownership would have been grounds for disqualification under 28 U.S.C. § 455. That the information reached the moving party late would be no basis for refusing discovery, see Liljeberg, 486 U.S. at 863-70, 108 S.Ct. at 2204-08, so long as the party acted in good faith and made out a reasonable case that discovery might lead to relevant information. See Fed.R.Civ.P. 26.
 
 
 32
 The same would be true if we held--mistakenly--that disability is a proper ground for setting aside a district court judgment. The Tribes have made a strong showing that Judge Boldt was mentally impaired when he decided their case. They are, after all, relying on the statement of a close relative who has no conceivable motive to lie and who appears to have a clear memory of when the judge's mental impairment became apparent. There is also a death certificate showing that the judge was diagnosed with Alzheimer's in 1978--a year before he rendered the disputed judgement. While the majority may be correct that Judge Boldt "knew his surgery had physically weakened him," maj. op. at 13959, there is no evidence he knew the extent of his mental impairment. See Lawrence K. Altman, Alzheimer's Dilemma: Whether to Tell People They Have the Disease, N.Y. Times, April 7, 1992, at C3 (noting that early symptoms are ambiguous and that "people with Alzheimer's have ... a strong tendency to deny their condition."). If disability were a proper basis for setting aside the judgment, I can see no basis for denying the Tribes the right to seek discovery from the judge's doctors to confirm or refute speculation about the judge's competence.
 
 
 33
 * * *
 
 
 34
 We have come a long way from the day when discussion of a judge's mental state was considered a breach of decorum. See Slayton v. Smith, 404 U.S. 53, 54, 92 S.Ct. 174, 174, 30 L.Ed.2d 209 (1971) (per curiam) (chastising court of appeals for mentioning "so delicate a subject" as a judge's mental condition in a published opinion) (vacating Smith v. Cox, 435 F.2d 453, 459-60 (4th Cir.1970)). With the size of the federal judiciary steadily on the rise, and with advances in medical technology making it possible to survive disabilities that would have been fatal in earlier days, the delicate question of whether a judge has (or in the past had) the mental capacity to sit will become increasingly troublesome.
 
 
 35
 My problem with the majority opinion is that it provides no answer to the central question raised by the Tribes: Are parties entitled to set aside a judgment if they can prove that the judge was non compos mentis at the time he rendered his decision? By resolving the case under the nebulous abuse of discretion standard, my colleagues leave open the possibility that, based on some other showing--or perhaps based on a similar showing presented to a different district judge--relief may be available. See note 3 supra. This is an open invitation to parties to rummage through the health records of judges who ruled against them five, ten, even twenty years ago, in the hope of coming up with a more compelling showing--or a district judge more receptive to the idea of reopening past judgments.
 
 
 36
 This is very bad medicine. Congress withheld mental disability as a basis for disqualifying judges; we have no business suggesting that perhaps "Rule 60(b)(6) gives the district court the power to correct a manifest injustice arising from a judge's disability...." Maj. op. at 13960. We should slam the door hard on the possibility--so hard that others will be discouraged from taking the same tack--by saying that Rule 60(b) may not be used to set aside a judgment based on a federal judge's perceived lack of mental competence. Period.
 
 
 
 [1]
 The Lummi won fishing rights in 1974, United States v. Washington, 384 F.Supp. 312, 327 n. 2 (W.D.Wash.1974), aff'd, 520 F.2d 676 (9th Cir.1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), but they took no position in the case at bar
 
 
 [2]
 The treaties are named for Isaac I. Stevens, the Governor of the Washington Territory, who negotiated eleven treaties on behalf of the United States with several Indian tribes in 1854 and 1855
 
 
 [3]
 There was great resistance to Judge Boldt's decision and, consequently, enormous demands on the district court:
 "The state [of Washington]'s extraordinary machinations in resisting the decree have forced the district court to take over a large share of the management of the state's fishery in order to enforce its decrees. Except for some desegregation cases, the district court has faced the most concerted official and private efforts to frustrate a decree of a federal court witnessed in this century." Puget Sound Gillnetters Ass'n v. United States Dist. Court, 573 F.2d 1123, 1126 (9th Cir.1978) (citations omitted), aff'd in part and vacated in part, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). The issue of what, if any, right Indians had to fish under the Stevens Treaties ultimately reached the Supreme Court in 1979. This was only after the Washington State Supreme Court enjoined the Washington State Department of Fisheries from adopting fishing regulations to protect the Indians' treaty rights. Puget Sound Gillnetters Ass'n v. Moos, 88 Wash.2d 677, 565 P.2d 1151 (1977); Washington State Commercial Passenger Fishing Vessel Ass'n v. Tollefson, 89 Wash.2d 276, 571 P.2d 1373 (1977), vacated and remanded, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). The Supreme Court affirmed Judge Boldt's reading of the Stevens Treaties. 443 U.S. at 685, 99 S.Ct. at 3074. Indeed, Judge Boldt's 1974 decision has become an integral part of natural resource management in the northwest. State governments follow it when crafting fish management plans. See United States v. Washington, 626 F.Supp. 1405, 1527 (W.D.Wash.1985) (approving the 1985 Puget Sound Management Plan); United States v. Oregon, 913 F.2d 576 (9th Cir.1990) (approving the Columbia River Fish Management Plan), cert. denied, 501 U.S. 1250, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991). So does the federal government. See 60 Fed.Reg. 21746, 21750 (May 3, 1995) (salmon fisheries regulations concerning the treaty tribes). Judge Boldt's 1974 decision even affects international agreements. See Confederated Tribes & Bands of Yakima Indian Nation v. Baldrige, 605 F.Supp. 833 (W.D.Wash.1985) (approving stipulations regarding the United States-Canada Pacific Salmon Treaty); 16 U.S.C. § 3632 (creating a tribal seat on the International Pacific Salmon Commission); 50 C.F.R. § 301.20 (International Pacific Halibut Commission regulations concerning the treaty tribes).
 
 
 [1]
 Section 372 seems to authorize only prospective relief. The judicial councils, insofar as I am aware, may not take action in a pending case. Indeed, our judicial council has stated repeatedly that it may not address any matter that concerns the merits of a case and might be raised through normal channels of appellate review. See In re Charge of Judicial Misconduct, 691 F.2d 924, 925 (9th Cir.Jud.Coun.1982) ("The complaint procedures of [section 372] provide administrative remedies only in the absence of an appropriate judicial remedy."); In re Charge of Judicial Misconduct, 685 F.2d 1226, 1227 (9th Cir.Jud.Coun.1982) ( section 372 relief not available when matter is "reviewable under any other provision of law on the record" (quoting S.Rep. No. 362, 96th Cong., 2d Sess. 3 (1980), reprinted in 1980 U.S.C.C.A.N. 4315, 4317))
 
 
 [2]
 The decision of the judicial council is not reviewed by any court; appeal is to the Judicial Conference of the United States. 28 U.S.C. § 372(c)(10)
 
 
 [3]
 The majority also seems to suggest that the effect of Judge Boldt's disability, if any, was ephemeral because the magistrate below and the court of appeals above agreed with him. Maj. op. at 13960. Whatever one may think of this argument--which seems to seriously understate the role of the district judge--it would presumably apply only to cases where the key rulings concerned questions of law. In cases where a judge exercised powers peculiar to a nisi prius court--such as making findings of fact or exercising discretion--this portion of the majority's analysis would seem to cut the other way