UNITED STATES of America et al., Plaintiffs,

and

Samish, Snohomish, Snoqualmie and Steilacoom Indian Tribes, Plaintiffs-Intervenors/Appellants,

and

Duwamish Indian Tribe, Plaintiff-Intervenor/Appellant,

v.

STATE OF WASHINGTON et al., Defendants.

Nos. 79–4447, 79–4472.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 11, 1980.

Decided April 20, 1981.

Rehearing and Rehearing En Banc Denied June 5, 1981.

As Corrected June 8, 1981.

Alan C. Stay, Seattle, Wash., for plaintiffs-appellants Samish Tribe.

David C. Shilton, George D. Dysart, Washington, D. C., plaintiff-appellee United States.

Lewis A. Bell, Everett, Wash., for plaintiffs-appellees Tulalip Tribes.

Dennis Reynolds, Olympia, Wash., for defendants-appellees State of Wash.

Before WRIGHT and CANBY, Circuit Judges, and PATEL, District Judge.*

EUGENE A. WRIGHT, Circuit Judge:

In the 1850's several Indian tribes were induced to relinquish much of their aboriginal land so that white people could settle in Washington Territory. The tribes received certain payments and were allowed to keep small parcels of land on which to live. In addition, because fishing was the source of their livelihood, they reserved the right of taking fish at all usual and accustomed grounds in common with citizens of the Territory.[1]

More than a century later, when fish had grown scarce, the Indians who remained took only a small percentage of the fish harvest in Washington State.[2] Judge Boldt then held that the treaty tribes were entitled to take up to fifty percent of the harvestable fish on runs passing through their traditional off-reservation fishing grounds. *United States v. Washington*, 384 F.Supp. 312, 343 (W.D.Wash.1974), aff'd, 520 F.2d 676, 682 (9th Cir. 1975), *cert. denied*, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). The Boldt decision was substantially upheld by the Supreme Court in *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 685, 99 S.Ct. 3055, 3074, 61 L.Ed.2d 823 (1979).[3]

After Judge Boldt's initial decision, several groups of Indians, including the appellants, intervened to assert treaty fishing rights. *United States v. Washington*, 476 F.Supp. 1101 (W.D.Wash.1979). The parties agree that the appellants' members are descendants of treaty-signatory tribes. But the appellants' ancestors did not go to reservations, because the reservations were inadequate. *Id.* at 1102. The appellants now

---

\* Of the Northern District of California.

1. Language to this effect is found in several treaties negotiated by Isaac Stevens, Territorial Governor, on behalf of the United States. The Steilacoom Tribe was a party to the Treaty of Medicine Creek, 10 Stat. 1132 (signed December 26, 1854; ratified March 3, 1855; proclaimed April 10, 1855). The Duwamish, Samish, Snohomish, and Snoqualmie Tribes were parties to the Treaty of Point Elliott, 12 Stat. 927 (signed January 22, 1855; ratified March 8, 1859; proclaimed April 11, 1859).

For a more extensive discussion of the Stevens treaties and the general context of this litigation, see *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 661–74, 99 S.Ct. 3055, 3063–69, 61 L.Ed.2d 823 (1979).

2. Between 1970 and 1973, Indians took only five percent of the total catch in Washington State. "Fishing Treaty Facts and Figures," Northwest Indian Fisheries Commission Annual Report 1980, p. 12.

3. *See generally* Case Note, *Fishing Vessel Association: Resolution of Indian Fishing Rights under Northwest Treaties*, 16 Willamette L.Rev. 931 (1980).

live among non-Indians and are not federally recognized.

Emphasizing nonrecognition, the lack of a geographic base, and the absence of formal tribal control over members, the United States and other appellees assert that the appellants are not the tribes that signed the treaties but are merely social clubs or businesses and are not entitled to exercise treaty fishing rights.

The district court agreed with the United States, *id.* at 1104, and adopted, without substantial change, its proposed findings and conclusions.[4] The appellants contend that the court applied an incorrect legal standard, made findings of fact that were clearly erroneous, and was bound by other judgments and the law of the case to decide differently. We affirm.

## I.

█ Verbatim adoption of proposed findings of fact by the district court is ordinarily disfavored and calls for close scrutiny by an appellate court. *Hagans v. Andrus,* ── F.2d ── at ──, No. 79–4424 (9th Cir., February 5, 1981); *Photo Electronics Corp. v. England,* 581 F.2d 772, 777 (9th Cir. 1978). But the district court's findings still must be upheld unless clearly erroneous. Fed.R.Civ.P. 52(a); *Hagans v. Andrus,* ── F.2d at ──.

█ We may uphold correct conclusions of law even though they are reached for the wrong reason or for no reason, and we may affirm a correct decision on any basis supported by the record. *United States v. Humboldt County,* 628 F.2d 549, 551 (9th Cir. 1980). We must remand, however, if the district court's application of an incorrect legal standard leaves us with an inadequate factual record on which to affirm.

*See Amador Beltran v. United States,* 302 F.2d 48, 52 (1st Cir. 1962).

## II.

Reviewing Judge Boldt's initial decision, we indicated that treaty-tribe status is established when "a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained an organized tribal structure." 520 F.2d at 693. Whether these conditions are met "is a factual question which a district court is competent to determine." *Id.* The appellants contend that the district court applied the wrong standard in determining that tribal structure had not been maintained.

### A. *Federal Nonrecognition*

We stated that "[n]onrecognition of the tribe by the federal government . . . may result in loss of statutory benefits, but can have no impact on vested treaty rights." *Id.* Judge Boldt subsequently stated, in resolving the present dispute: "Only tribes recognized as Indian political bodies by the United States may possess and exercise the tribal fishing rights secured and protected by the treaties of the United States." 476 F.Supp. at 1111.

█ This conclusion is clearly contrary to our prior holding and is foreclosed by well-settled precedent. *See, e. g., Menominee Tribe v. United States,* 391 U.S. 404, 412–13, 88 S.Ct. 1705, 1710–11, 20 L.Ed.2d 697 (1968); *Kimball v. Callahan,* 493 F.2d 564, 568 (9th Cir.), *cert. denied,* 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974). The Department of the Interior cannot under any circumstances abrogate an Indian treaty directly or indirectly. Only Congress can abrogate a treaty, and only by making absolutely clear its intention to do so. *See*

---

4. In 1974 Judge Boldt referred to a magistrate the question whether the appellants were the political successors-in-interest of treaty signatories. After a three-day hearing, the magistrate concluded that they were not.

Rather than immediately adopting the magistrate's conclusions, Judge Boldt tried the matter. It was submitted in 1977 but not decided until 1979.

*Menominee Tribe v. United States,* 391 U.S. at 412–13, 88 S.Ct. at 1710–11.[5]

### B. *Other Considerations*

Although the district court erred in stating that federal recognition is required to establish and exercise treaty rights, it identified other considerations as well. The appellees contend that these considerations support the court's decision.

The court observed that treaty rights are communal in nature and listed six considerations in determining whether a group of Indians forms the requisite communal unit:

[1] the extent to which the group's members are persons of Indian ancestry who live and were brought up in an Indian society or community,

[2] the extent of Indian governmental control over their lives and activities,

[3] the extent and nature of the members' participation in tribal affairs,

[4] the extent to which the group exercises political control over a specific territory,

[5] the historical continuity of the foregoing factors, and

[6] the extent of express acknowledgement of such political status by . . . federal authorities . . .

*United States v. Washington,* 476 F.Supp. at 1110.

The appellants point out that almost all of these factors involve, at least to some extent, federal recognition or residence on a reservation. The United States gave their ancestors inadequate reservations in the 19th century, and the policy of the United States through the early part of the 20th century was to discourage Indians from living in separate communities. *Id.* at 1103. They argue that these actions by the United States should not be allowed to divest them of their treaty rights.

The district court's statement that federal nonrecognition is decisive, together with its listing of other purported considerations, makes it difficult for us to determine the precise basis for the court's holding that the tribes may not exercise treaty rights. Moreover, although some of the other considerations mentioned by the district court may be relevant, they do not adequately define the controlling principles. We must examine the record in light of these principles to determine whether the district court reached the correct result.

### C. *The Proper Inquiry*

■ The appellants' members do not seek compensation as individuals for violations of their ancestors' rights. *Cf. Menominee Tribe v. United States,* 391 U.S. at 407, 88 S.Ct. at 1708 (compensation sought for abrogation of treaty). The appellants seek to exercise treaty rights as tribes. They may do so only if they are the tribes that signed the treaties.

■ We have defined a single necessary and sufficient condition for the exercise of treaty rights by a group of Indians descended from a treaty signatory: the group must have maintained an organized tribal structure. *United States v. Washington,* 520 F.2d at 693.

This single condition reflects our determination that the sole purpose of requiring proof of tribal status is to identify the group asserting treaty rights as the group named in the treaty. For this purpose, tribal status is preserved if some defining

---

**5.** In *Menominee,* an act of Congress expressly terminated all federal supervision and protection of the tribe. Members of the terminated tribe sought compensation for abrogation of treaty hunting and fishing rights. The Supreme Court held that the treaty had not been abrogated. 391 U.S. at 412, 88 S.Ct. at 1710. Despite congressional termination of all formal tribal political authority, treaty rights survived. *See* Clinton & Hotopp, *Judicial Enforcement of the Federal Restraints on Alienation of Indian Land: The Origins of the Eastern Land Claims,* 31 Maine L.Rev. 17, 61 (1979). It follows, *a fortiori,* that administrative nonrecognition cannot destroy vested treaty rights.

characteristic of the original tribe persists in an evolving tribal community.

■ The tribe need not have acquired organizational characteristics it did not possess when the treaties were signed. The white negotiators imputed to many of the treaty tribes a tribal structure they did not have.[6] A structure that never existed cannot be "maintained."

Furthermore, changes in tribal policy and organization attributable to adaptation do not destroy tribal status. Over a century, change in any community is essential if the community is to survive. Indian tribes in modern America have had to adjust to life under the influence of a dominant non-Indian culture. Note, *The Unilateral Termination of Tribal Status*, 31 Maine L.Rev. 153, 164 n. 55 (1979).

Federal policy has sometimes favored tribal autonomy and sometimes sought to destroy it. *See United States v. Washington*, 476 F.Supp. at 1103; G. Taylor, *The New Deal and American Indian Tribalism* 1–16 (1980). A degree of assimilation is inevitable under these circumstances and does not entail the abandonment of distinct Indian communities. *See* Note, 31 Maine L.Rev. at 164 n. 55.[7]

■ When assimilation is complete, those of the group purporting to be the tribe cannot claim tribal rights. While it might be said that the result is unjust if the tribe

has suffered from federal or state discrimination, it is required by the communal nature of tribal rights. To warrant special treatment, tribes must survive as distinct communities. *See, e. g., United States v. Antelope*, 430 U.S. 641, 646, 97 S.Ct. 1395, 1398, 51 L.Ed.2d 701 (1977); *United States v. Mazurie*, 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975).

■ The appellants point to their management of interim fisheries, pursuit of individual members' treaty claims, and social activities as evidence of tribal organization. But the district court specifically found that the appellants had not functioned since treaty times as "continuous separate, distinct and cohesive Indian cultural or political communit[ies]." 476 F.Supp. at 1105, 1106, 1107, 1109, 1110.

After close scrutiny, we conclude that the evidence supports this finding of fact. Although the appellants now have constitutions and formal governments, the governments have not controlled the lives of the members. Nor have the appellants clearly established the continuous informal cultural influence they concede is required.

The appellants' members are descended from treaty tribes, but they have intermarried with non-Indians and many are of mixed blood. That may be true of some members of tribes whose treaty status has been established. But unlike those persons,

---

**6.** "[S]ome bands of Indians [that signed the Stevens treaties] ... had little or no tribal organization." *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 664, 99 S.Ct. 3055, 3064, 61 L.Ed.2d 823 (1979) (footnote omitted). "Indeed, the record shows that the territorial officials who negotiated the treaties on behalf of the United States took the initiative in aggregating certain loose bands into designated tribes and even appointed many of the chiefs who signed the treaties." *Id.* at 664 n. 5, 99 S.Ct. at 3064 n. 5 (citation omitted).

One writer maintains: "Tribe is most appropriately a cultural concept. Except for some eastern woodland confederacies, few Indians had tribal organizations that governed their activities." G. Taylor, *The New Deal and American Indian Tribalism* 2 (1980).

*See also Elser v. Gill Net Number One*, 246 Cal.App.2d 30, 38, 54 Cal.Rptr. 568, 575 (1966) ("tribe," applied to California Indians, must "be understood as synonymous with 'ethnic group'" rather than as denoting political unity' " because tribes in the political sense did not exist in California when Indian fishing rights statute was adopted).

**7.** "[I]f a group of Indians has a set of legal rights by virtue of its status as a tribe, then it ought not to lose those rights absent a voluntary decision made by the tribe and its guardian, Congress, on its behalf." *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 586 (1st Cir.) (citations omitted), *cert. denied*, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979).

those who comprise the groups of appellants have not settled in distinctively Indian residential areas.

We cannot say, then, that the finding of insufficient political and cultural cohesion is clearly erroneous.

## III.

We have considered the appellants' other contentions and conclude that they lack merit.

### A. Burden of Proof

■ The appellants had the burden of proving that they were entitled to exercise tribal treaty rights. We reject their argument that, because their ancestors belonged to treaty tribes, the appellants benefitted from a presumption of continuing existence.

They maintain that, just as conspiracy and parental relationships once proved are presumed to continue, so is tribal existence. The problem with such analogies is that the appellants have not proved that they are the tribes that existed at treaty times so as to benefit from any presumption of continuing existence.

### B. Other Judgments

■ The appellants contend that the court was bound by decisions of the Indian Claims Commission and the Court of Claims in which the appellants were allowed to pursue claims on behalf of members. *Snoqualmie Tribe v. United States*, 372 F.2d 951, 957–58 (Ct.Cl.1967); *Samish Tribe v. United States*, 6 Ind.Cl.Comm. 159 (1958).

These claims, however, involved compensation for individuals, not fishing rights for tribal units. The causes of action and factual issues litigated were different, and the doctrines of res judicata and collateral estoppel are therefore inapplicable. 1B *Moore's Federal Practice* ¶ 0.405[1], [3].

### C. The Law of the Case

■ The appellants also contend that the court was bound by the law of the case to recognize their treaty status. They point out that the Stillaguamish and Upper Skagit Tribes were deemed to have fishing rights even though their membership rolls had not been federally approved and they do not live on reservations. *See United States v. Washington*, 384 F.Supp. at 327, 378–79. The law of the case, however, is that maintenance of tribal structure is a factual question, and we have concluded that the district court correctly resolved this question despite its failure to apply the proper standard.[8]

AFFIRMED.

CANBY, Circuit Judge, dissenting:

I respectfully dissent. The majority opinion quite correctly rejects the conclusion of law that federal recognition is essential to the exercise of treaty rights. As I understand it, the majority opinion states the determinative question to be whether appellants have descended from treaty signatories and have maintained tribal structures reflecting the degree of organization that existed at the time of the treaties, with reasonable allowances for adaptation to changing conditions. Tribal status is preserved "if some defining characteristic of the original tribe persists in an evolving tribal community." *Ante*, at pp. 1372–1373. With all of these propositions I agree.

My difference with the majority is that I am unable to say that the findings of the district court resolve the determinative question of tribal continuity or provide us with the means to do so upon review. It is true that the district court found that appellants had not functioned since treaty times as "continuous separate, distinct and cohesive Indian cultural or political commun[ies]." *United States v. Washington*,

---

8. Because the district court's ultimate conclusion was correct, the denial of relief cannot be considered "arbitrary and capricious," as the

Duwamish Tribe contends. The propriety of the relief granted to the Stillaguamish and Upper Skagit Tribes is not at issue in this appeal.

476 F.Supp. 1101, 1105, 1106, 1107, 1109, 1110 (W.D.Wash.1979). It also found that none of the appellants had "maintained an organized tribal structure in a political sense." *Id.* at 1105, 1106, 1108, 1109, 1110. These findings, however, do not take account of the nature and degree of tribal organization existing at the time of the treaties. They are not addressed to the proper requirement that "some defining characteristic of the original tribes persist in an evolving tribal community." They appear instead to reflect a more stringent requirement of tribal organization—a requirement based upon the erroneous assumption that federal recognition is essential to the exercise of treaty rights.

Other findings of the district court reflect the degree to which the assumed need for federal recognition permeated the entire factual inquiry. The following finding regarding the Samish Tribe is typical and illustrative:

> (25). The Intervenor Samish Tribe exercises no attributes of sovereignty over its members or any territory. It is not recognized by the United States as an Indian governmental or political entity possessing any political powers of government over any individuals or territory. None of its organizational structure, governing documents, membership requirements nor membership roll has been approved or recognized by Congress or the Department of Interior for purposes of administration of Indian affairs.... *Id.* at 1106.

It seems evident in this finding that the "attributes of sovereignty" found to be lacking in the Samish Tribe are those arising from federal recognition.

The conclusions of law make quite clear what was meant by the district court in its factual findings that the appellants did not maintain continuous cultural or political communities or organized tribal structures in a political sense. The first conclusion of law recites that fishing rights are communal and "are held today for the use and benefit of the persons who continue to maintain a tribal structure exercising governmental or political powers." *Id.* at 1110. The second conclusion then lists certain factors for determining "whether a group of persons have maintained Indian tribal relations and a tribal structure sufficient to constitute them an Indian tribe having a continuing special political relationship with the United States ..." [1] *Id.* Two of the six factors—the extent of Indian governmental control over members' lives and the extent of political control over a specific territory—are largely functions of federal recognition, while the final factor is federal recognition itself: "The extent of express acknowledgement of such political status by ... federal authorities." The fourth conclusion of law then states that "[o]nly tribes recognized as Indian political bodies by the United States may possess and exercise the tribal fishing rights secured and protected by the treaties of the United States." *Id.* at 1111. This progression clearly has the effect of requiring federal recognition in order for a tribe to have the type of structure enabling it to exercise treaty rights.

If this error were confined to the conclusions of law, then affirmance might nevertheless be in order. But the conclusions of law help to illustrate the deficiencies of the findings of fact upon which the decision of the district court is based. The findings that appellants had not maintained a "continuous separate, distinct and cohesive Indian cultural or political communit[ies]" or "organized tribal structure[s] in a political sense" amounted in context to findings that appellants lacked federal recognition or attributes necessarily dependent upon federal recognition. These findings consequently do not resolve the crucial factual issue and cannot support the judgment.

---

1. To the extent that this conclusion suggests that the existence of a trust relationship with the United States is essential to the exercise of treaty rights, it is erroneous. *Menominee Tribe v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *Kimball v. Callahan*, 493 F.2d 564 (9th Cir.), *cert. denied*, 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974).

Application of the proper legal standards to this case requires new determinations of fact, and possibly additional evidence relating to the political organization of the relevant tribes at treaty times. I would therefore remand the matter to the district court for determinations whether appellants have maintained tribal structures reflecting the degree of organization that existed at the time of the treaties, with reasonable allowances for adaptation to changing conditions, and whether some defining characteristic of the original tribes persists in appellants as evolving tribal communities.