901 F.2d 772
 UNITED STATES of America, Plaintiff-Appellee,
and
Tulalip Tribes of Washington; Lummi Indian Tribe;
Muckleshoot Indian Tribe, and Upper Skagit Tribe,
Plaintiffs-Appellees,
v.
SUQUAMISH INDIAN TRIBE, Plaintiff-Appellant,
v.
State of Washington, et al., Defendants.
 No. 89-35254.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 6, 1990.
Decided April 19, 1990.
 
 John Henry Browne, Browne, Ressler & Foster, Seattle, Wash., for plaintiff-appellant (Suquamish Indian Tribe).
 Mason D. Morisset, Pirtle, Morisset, Schlosser & Ayer, Seattle, Wash., for Tulalip Indian Tribe.
 Daniel A. Raas, Bellingham, Wash. for Lummi Indian Tribe.
 Gregory M. O'Leary, Heller, Ehrman, White & McAuliffe, Seattle, Wash., for Muckleshoot Tribe.
 Edward G. Maloney, Jr., Sedro Woolley, Wash., for Upper Skagit Tribe.
 John T. Stahr, Dept. of Justice, Washington, D.C., for plaintiffs-appellees.
 Appeal from the United States District Court for the Western District of Washington.
 Before WRIGHT, REINHARDT and O'SCANNLAIN, Circuit Judges.
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 The Suquamish Indian Tribe of western Washington seeks an adjudication that it is the successor to the former Duwamish Tribe and entitled to exercise the fishing rights of the Duwamish. The district court denied relief.
 
 BACKGROUND
 
 2
 The Suquamish filed this action as a separate proceeding in a continuing case that relates to the nature and extent of treaty Indian fishing rights in western Washington. See United States v. Washington, 384 F.Supp. 312 (W.D.Wash.1974) (Boldt decision), aff'd, 520 F.2d 676 (9th Cir.1975). In that decision, the district court held that tribes that signed the Treaty of Point Elliott could exercise their treaty protected fishing rights in "usual and accustomed" places.[1] 384 F.Supp. at 343. The tribes were entitled to take up to 50 percent of the harvested fish from runs passing through their off-reservation grounds. Id. The Supreme Court substantially upheld the Boldt decision in Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 685, 99 S.Ct. 3055, 3074, 61 L.Ed.2d 823 (1979).
 
 
 3
 In 1975, the Suquamish, not a party to that case, sought a determination of its usual and accustomed fishing places in western Puget Sound. United States v. Washington, 459 F.Supp. 1020 (W.D.Wash.1978). The district court found that the Suquamish, a party to the Treaty of Point Elliott, held usual and accustomed fishing places in several areas on the west side of Puget Sound. Id. at 1049.
 
 
 4
 In May 1985, the Suquamish filed this action to determine their usual and accustomed fishing places on the eastern side of Puget Sound. At the time of the Treaty of Point Elliott, they did not fish in those areas, which were the usual and accustomed fishing places of the Duwamish.[2] The Suquamish argued that they could assert the fishing rights of the Duwamish because they were the successor in interest to the Duwamish.
 
 
 5
 The district court in July 1987 referred this question to a special master over the objection of the Suquamish. The court appointed Robert Cooper, a retired magistrate, who had served in other United States v. Washington proceedings. After a two day trial, he filed his report, recommending the Suquamish request be denied. The district court adopted the report, finding that the Suquamish did not have the status of successor in interest.
 
 
 6
 The Suquamish challenge the court's ruling on two grounds, contending that the court (1) abused its discretion in referring the matter to a special master under Federal Rule of Civil Procedure 53; and (2) erred in finding that the Suquamish were not the successors to the Duwamish. The Muckleshoot, who fish currently in eastern Puget Sound, and the Tulalip, Lummi and Upper Skagit Tribes join in opposing the contentions of the Suquamish.
 
 ANALYSIS
 
 7
 I. Did the District Court Err When it Appointed a Special Master?
 
 A. Appointment
 
 8
 A court may appoint a special master under exceptional conditions. Fed.R.Civ.P. 53(a).[3] We review the court's referral to a special master for abuse of discretion. Hoptowit v. Ray, 682 F.2d 1237, 1263 (9th Cir.1982).
 
 
 9
 The Suquamish contend that the order of referral did not show any exceptional condition and that there is none.[4] We disagree.
 
 
 10
 Masters may be appointed to aid a district court in the enforcement of its decree. See, e.g., Organization for Reform of Marijuana Laws v. Mullen, 828 F.2d 536, 543 (9th Cir.1987). This proceeding is part of the district court's continuing jurisdiction to implement its decree in the Boldt decision under which appointment of a master was to be determined as needed. See Washington, 384 F.Supp. at 408. Throughout the long history of this litigation, the district court has referred similar matters to special masters.[5] See, e.g., United States v. Lummi Indian Tribe, 841 F.2d 317, 318 (9th Cir.1988) (special master determined that evidence supported the Tulalip claim to expand usual and accustomed fishing grounds); United States v. Washington, 730 F.2d 1314, 1315 (9th Cir.1984); United States v. Washington, 626 F.Supp. 1405, 1487 (W.D.Wash.1985), aff'd, United States v. Skokomish Indian Tribe, 764 F.2d 670 (9th Cir.1985); Washington, 459 F.Supp. at 1041-42, 1068-69. Here, the special master contributed substantial experience and assistance to the court in fashioning its decree.
 
 
 11
 Masters may also be appointed because of the complexity of litigation and problems associated with compliance with the district court order. Hoptowit, 682 F.2d at 1263. We cannot think of a more comprehensive and complex case than this. Since 1974, there have been numerous supplemental proceedings with voluminous filings. In the proceedings below, this was one of 14 sub-proceedings and over 11,000 papers had been filed with the district court.[6]
 
 
 12
 We hold that there were exceptional conditions to justify the appointment of a special master. There was no abuse of discretion.
 
 B. Compensation
 
 13
 The court determines the compensation of a magistrate. Fed.R.Civ.P. 53(a). The Suquamish Tribe asserts that requiring it to pay for the services of the special master was an abuse of discretion.
 
 
 14
 We disagree. In Judge Coyle's Order of February 23, 1989, he divided the special master's compensation of $1,530 among the five parties, the four tribes, and the United States. Each was to pay a modest $306. Judge Coyle found that the $1,500 request was reasonable, and the Suquamish Tribe did not then object to paying its share. There was no abuse of discretion.[7]
 
 
 15
 II. May the Suquamish Assert the Fishing Rights of the Duwamish?
 
 A. Proper Legal Standard
 
 16
 The Suquamish allege that they have the right to fish in areas east of Puget Sound because they are the successor in interest to the Duwamish.[8] They bear the burden of demonstrating successorship. See Lummi Indian Tribe, 841 F.2d at 318. We review de novo the question of what legal standard controls.
 
 
 17
 When a tribe asserts fishing rights reserved to signatory tribes under the Treaty of Point Elliott, our decision in United States v. Washington, 641 F.2d 1368 (9th Cir.1981), provides the appropriate legal standard.[9] That a tribe includes descendants of treaty-signatory tribes does not alone allow it the fishing rights of a treaty tribe. Id. at 1370-71. To acquire the rights of a treaty-signatory tribe, a contemporary tribe must obtain "treaty tribe status." Id.
 
 
 18
 A tribe establishes treaty tribe status from a tribe that signed the Treaty of Point Elliott by establishing that " 'a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained an organized tribal structure.' " Id. (quoting United States v. Washington, 520 F.2d 676, 693 (9th Cir.1975)). An organized tribal structure may be preserved "if some defining characteristic of the original tribe persists in an evolving tribal community."[10] Washington, 641 F.2d at 1372-73. Changes in tribal policy and organization attributable to adaptation will not necessarily destroy treaty tribe status. Id. at 1373.
 
 
 19
 In Washington, we considered whether modern tribes, alleging they were the descendants of signatory tribes, could obtain treaty tribe status. We concluded that they could, if they met the test stated above. When, as here, one signatory tribe claims the rights of a second signatory tribe, we hold that treaty tribe status may also be had. We agree, however, with the district court that an additional requirement must be met to establish treaty tribe status in this instance. The court must:
 
 
 20
 look to all indicia of tribal relationship to assess whether there has been a consolidation or merger of the tribes, or cohesive bands thereof, sufficient to combine their tribal or political structures. (emphasis added)
 
 
 21
 Order Adopting Special Master's Report and Recommendation at 18.
 
 
 22
 We hold that for a signatory tribe to obtain treaty tribe status from another signatory tribe, it must first show that the two tribes or cohesive bands thereof consolidated or merged and demonstrate also that together they maintain an organized tribal structure.[11] If the signatory tribe meets that burden, then it may exercise the treaty rights of both signatory tribes.
 
 
 23
 The district court properly required the Suquamish to show that the Duwamish had merged or consolidated with them.
 
 B. Factual Findings
 
 24
 The district court's determination that the Duwamish Tribe had not merged with the Suquamish Tribe is a factual matter which we review for clear error. See Washington, 641 F.2d at 1371.
 
 
 25
 The Suquamish argue that they have presented sufficient evidence to establish that they are the successors in interest to the Duwamish. They presented evidence which, they argued, established that the United States intended to consolidate the two tribes. They relied on (1) a report by George Gibbs that the United States intended originally for the two tribes to be consolidated on the Port Madison Reservation,[12] (2) the reference to Chief Seattle as Chief of both the Duwamish and the Suquamish in the Treaty of Point Elliott, and (3) the grant of nine allotments by the United States to Duwamish Indians on the Port Madison Reservation, which was on the west side of Puget Sound.
 
 
 26
 Despite the Gibbs report, the court found that no evidence showed that the United States ever acted to relocate the Duwamish to Port Madison. It found that the reference to Chief Seattle as Chief of the two tribes did not reflect the political organization of the tribes or that the United States intended to consolidate the two. It found that the grant of allotments to Duwamish persons reflected the government's willingness to provide allotments to those with some Duwamish blood, but that the Suquamish presented no evidence that the approval of these allotments reflected a consolidation of the two tribes by the United States or a tribal decision to merge. The court's findings are not clearly erroneous.
 
 
 27
 Next, the Suquamish presented evidence that individual Duwamish moved to and settled at the Port Madison Reservation. They had no evidence, however, that a band or group moved there. The court found that those who moved to Port Madison would retain personal rights to return to their natal territory to fish, but that they could not transfer their rights to persons or tribes. See Washington, 641 F.2d at 1373 (fishing rights communal). Thus, it found that the relocation of individual Duwamish to Port Madison would not have been perceived as a transfer of fishing rights to the Suquamish and that there was no basis to infer from the movement of some Duwamish that consolidation took place. These findings are not clearly erroneous.
 
 
 28
 Finally, the Suquamish presented evidence that 73.9% of its current members have some Duwamish ancestry. The district court found that it could not infer from this percentage that the two tribes had merged or consolidated. It noted that most Suquamish had only a very small percentage of Duwamish blood, which could easily be attributed to the tendency of the Suquamish to intermarry, and that the compilation did not compare the relative percentage of Duwamish ancestry among other tribes in the region. The district court did not clearly err.
 
 
 29
 Having reviewed the evidence, the district court found that:
 
 
 30
 1) the Duwamish and Suquamish Tribes were independent tribes when they signed the Point Elliott Treaty;
 
 
 31
 2) the Duwamish objected to being moved from their traditional home east of Puget Sound to the Port Madison Reservation west of it, and that there was animosity between the Suquamish and Duwamish;
 
 
 32
 3) in the years following the Treaty, the Duwamish did not intend to join or unite with the Suquamish and resisted efforts of the United States to unite them;
 
 
 33
 4) the United States continued to deal with the Duwamish as a distinct tribe; and
 
 
 34
 5) the Duwamish did not merge or consolidate with the Suquamish.
 
 
 35
 Having reviewed the record, we find that these factual findings are supported by Dr. Barbara Lane's testimony.[13] The district court did not clearly err when it found that the Suquamish did not merge with the Duwamish.
 
 CONCLUSION
 
 36
 The district court properly appointed a special master. It applied the correct legal standard in United States v. Washington, 641 F.2d 1368 (9th Cir.1981), to determine if the Suquamish were the successors in interest to the Duwamish. It did not clearly err in finding and concluding that the Suquamish did not merge with the Duwamish and were not entitled to exercise fishing rights on the east side of Puget Sound.
 
 
 37
 AFFIRMED.
 
 
 
 [1]
 Isaac Stevens, Territorial Governor, negotiated the Treaty of Point Elliott, 12 Stat. 927 (signed January 22, 1855; ratified March 8, 1859; proclaimed April 11, 1859), on behalf of the United States. The tribes that signed this Treaty relinquished much of their aboriginal land so that non-Indians could settle in Washington Territory. In exchange for their land, the tribes received small parcels on which to live and certain payments. Because fishing was the source of their livelihood, they reserved the right to take fish at all usual and accustomed grounds in common with citizens of the Territory
 For additional case history, see United States v. Washington, 759 F.2d 1353, 1355-56 (9th Cir.1985).
 
 
 [2]
 The usual and accustomed fishing grounds of the Duwamish on the eastern side of Puget Sound included, but were not limited to, Lake Washington, Lake Union, Lake Sammamish, the Black and Cedar Rivers, and the lower White or Duwamish River below its junction with the Green River
 
 
 [3]
 Rule 53(b) provides:
 A reference to a master shall be the exception and not the rule.... [I]n actions to be tried without a jury ... a reference shall be made only upon a showing that some exceptional condition requires it.
 
 
 [4]
 The Suquamish assert that because the question of whether they are the successor in interest to the Duwamish is novel and without precedent, an Article III judge should then issue. This assertion is without basis. We have previously decided if, under the Treaty of Point Elliott, a tribe is a successor in interest to another. See United States v. Washington, 641 F.2d 1368, 1371-74 (9th Cir.1981). In addition, we do not construe the Treaty of Point Elliott as the Suquamish contend we must
 
 
 [5]
 We note that special master Cooper was especially well-prepared to aid the district court because of his familiarity with this case. During his tenure as magistrate and later as a special master he has heard numerous other subproceedings. See, e.g., United States v. Washington, 626 F.Supp. 1405, 1487 (W.D.Wash.1985); Washington, 459 F.Supp. at 1028. His experience actually antedates that of the present judge
 
 
 [6]
 The Suquamish assert that a question may be referred to a special master only when it is complex or involves special expertise. This contention is without merit. The district court may refer a matter to a master when "exceptional conditions" are present in the case, not when the matter is itself exceptional
 
 
 [7]
 The Suquamish also imply that the district court did not review the transcript before adopting the report and recommendation of the special master. Judge Coyle's order stated specifically that he read the transcript of the proceedings before the special master
 
 
 [8]
 The Duwamish Tribe we refer to here held fishing rights acquired under the Treaty of Point Elliott. In an earlier proceeding, the district court found that the modern day Duwamish did not hold the fishing rights reserved to the Duwamish Tribe that signed the Treaty. United States v. Washington, 476 F.Supp. 1101, 1104-05 (W.D.Wash.1979). Although no tribe exercises these rights currently, the Muckleshoots have succeeded to the fishing rights of the Skopamish, Stkamish and Smulkamish for whom Chief Seattle signed as Chief of the Duwamish. See Washington, 384 F.Supp. at 365-67. These fishing grounds overlap with some of the usual and accustomed places of the treaty-time Duwamish
 
 
 [9]
 The Suquamish ignore our decision in Washington. Instead, they derive four factors from two district court opinions which, they assert, establish successorship. See Washington, 459 F.Supp. at 1058-60 (Tulalip successor in interest to Snoqualmie, Snohomish and Skykomish); Washington, 384 F.Supp. at 365-66 (Muckleshoot successor in interest to the Skopamish, Stkamish and Smulkamish). They contend that these factors apply:
 (1) The tribe claiming successorship must be a treaty tribe;
 (2) The reservation governed by the tribe claiming successorship must have been intended by the United States to be a home for the tribe whose fishing rights are claimed;
 (3) Individuals from the tribe whose rights are claimed must have moved to and settled on the reservation which the United States intended to be a home for them; and
 (4) Significant numbers of the present day membership of the tribe claiming successorship must be descendants of the tribe whose rights are claimed.
 We reject this purported legal standard. In the district court cases upon which they rely, the tribal claims to successorship were not contested.
 In addition, the district court rejected the analogy of the Suquamish to the Tulalip and Muckleshoot Tribes. It found, and we agree, that there are significant historical differences among the successorship claims. For example, unlike the Suquamish, the Tulalip and Muckleshoot Tribes did not exist at the time of the Point Elliott Treaty. They were made up of small bands that signed it and who went as such to the Tulalip and Muckleshoot Reservations. They became known as the Tulalip and Muckleshoot Indians. Unlike the Suquamish, who are located on the west side of Puget Sound, the Tulalip and Muckleshoot Tribes were made up of bands from the east side of the Sound.
 
 
 [10]
 Federal recognition by the Department of Interior is not required for a tribe to obtain treaty tribe status. Washington, 641 F.2d at 1371
 
 
 [11]
 A tribe must also show that it "descended from a treaty signatory." Washington, 641 F.2d at 1371. In this instance, however, the district court previously determined that the Suquamish and Duwamish were treaty signatories and that the contemporary Suquamish descended from the treaty time Suquamish
 
 
 [12]
 George Gibbs was a lawyer-enthnologist who served as Secretary to the 1855 Treaty Commission
 
 
 [13]
 Lane is an anthropologist upon whom Judge Boldt relied heavily in making his initial decision and who testified as an expert witness for both the Suquamish and the Muckleshoot in this proceeding. She gave no opinion on the successor in interest question. However, the Suquamish relied on a report she prepared about the history of the Duwamish at the Muckleshoot and Port Madison Reservations. Because of limitations in the scope of the report, the court found that it did not provide a basis for evaluating the distribution of the Duwamish as a whole after the Treaty of Point Elliott. Having reviewed the report, we agree