BEA, Circuit Judge,
dissenting.
Appellant Samish Indian Tribe (“Samish Tribe”) appeals the district court’s order denying the Samish Tribe’s motion pursuant to Federal Rule of Civil Procedure 60(b)(6) for relief from the district court’s prior judgment in United States v. Washington, 476 F.Supp. 1101 (W.D.Wash.1979), aff'd, 641 F.2d 1368 (9th Cir.1981) (“Washington II ”). The majority opinion holds that the district court abused its discretion in denying the Samish Tribe’s Rule 60(b)(6) motion because “[fjederal recognition [of the Samish Tribe] is determinative of the issue of tribal organization, the issue upon which the Samish were denied treaty fishing rights in Washington II” and “[a]s the Samish’s lack of recognition was a circumstance beyond the tribe’s control, their subsequent recognition is an extraordinary circumstance that warrants setting aside the judgment in Washington II.” Op. at 1161.
*1163 With respect, I believe the majority opinion errs in two regards. First, federal recognition as a tribe has never been required to establish off-reservation fishing rights pursuant to the Treaty of Point Elliott (1855), and the Samish Tribe was not precluded in Washington II from presenting evidence of having maintained an organized tribal structure, which evidence could have supported a finding that it was entitled to such treaty fishing rights. Second, neither the federal recognition of the Samish Tribe by the Bureau of Indian Affairs (“BIA”) nor the BIA’s underlying factual findings constitute evidence that the Samish Tribe maintained an organized tribal structure to which a district court determining treaty status must accord any deference. Because I believe the majority opinion departs from our jurisprudence in holding otherwise,[1] I respectfully dissent.
I.
A.
The issue before this court is not whether the Samish Tribe might qualify for off-reservation fishing rights pursuant to the Treaty of Point Elliott were it to commence an action today. Rather, as the majority opinion states: “The crucial issue here is whether the fact that the Samish had the opportunity to litigate this issue in Washington II means that the Samish were not ‘prevented ... from proceeding with the prosecution or defense of the action in a proper fashion.’ ” Op. at 1159 (internal citation omitted). The majority opinion answers in the negative; I believe our precedent requires an affirmative answer.
Our precedent in this area of the law and with regard to the very parties at issue here makes clear, if nothing else, that whether a group of Native Americans are recognized as a tribe by the federal government is a distinct legal inquiry from whether that same group of Native Americans qualify for off-reservation fishing rights pursuant to the Point Elliott and related treaties. Further, recognition as a tribe is not a necessary precondition to qualify for such treaty fishing rights.[2]
Thus, in United States v. Washington, 520 F.2d 676, 692-93 (9th Cir.1975) (“Washington I”) (emphasis added), we held: “Nonrecognition of the tribe by the federal government and the failure of the Secretary of the Interior to approve a tribe’s enrollment may result in loss of statutory benefits, but can have no impact on vested treaty rights.” Likewise, when the district court in Washington II held that “[o]nly tribes recognized as Indian political bodies by the United States may possess and exercise the tribal fishing rights secured and protected by the treaties of the United States,” 476 F.Supp. at 1111, we held on appeal:
This conclusion is clearly contrary to our prior holding and is foreclosed by well-established precedent.
* * *
*1164 We have defined a single necessary and sufficient condition for the exercise of treaty rights by a group of Indians descended from a treaty signatory: the group must have maintained an organized tribal structure.
Washington II, 641 F.2d at 1371, 1372; accord id. at 1374 (Canby, J., dissenting) (“The majority opinion quite correctly rejects the conclusion of law that federal recognition is essential to the exercise of treaty rights.”). In United States v. Suquamish Indian Tribe, 901 F.2d 772, 776 n. 10 (9th Cir.1990) (emphasis added), we noted that “[jfederal recognition by the Department of Interior is not required for a tribe to obtain treaty tribe status.” Again, in Greene I, “[w]e reeognize[d] that the two inquiries are similar,” but reiterated that “each determination serves a different legal purpose and has an independent legal effect” and that “[fjederal recognition is not a threshold condition a tribe must establish to fish under the Treaty of Point Elliott.” 996 F.2d at 976(emphasis added); accord id. at 981 (Reinhardt, J., dissenting) (arguing that “federal recognition necessarily qualifies for treaty rights a tribe that claims them,” but acknowledging that “federal recognition is not a precondition to receiving treaty rights”) (emphasis in original). Finally, in Greene v. Babbitt, 64 F.3d 1266, 1270 (9th Cir.1995) (“Greene II”), we reviewed our precedent and held once more: “[T]he recognition of the tribe for purposes of statutory benefits is a question wholly independent of treaty fishing rights .... Our decision in [Greene I ] can leave no serious doubt that our court regards the issues of tribal treaty status and federal acknowledgment as fundamentally different.”[3]
Our precedent is equally clear that although recognition as a tribe may be a decision generally left to the discretion of the Executive Branch, “[wjhether a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained an organized tribal structure [so as to qualify for off-reservation fishing rights pursuant to the Point Elliott and related treaties] is a factual question which a district court is competent to determine.” Washington I, 520 F.2d at 693; accord Washington II, 641 F.2d at 1371.
Thus, the fact alone that the Samish Tribe was not recognized by the federal government at the time of Washington II in no way prevented it from proffering the type of evidence that could have resulted in a finding by the district court in Washington II that the Samish Tribe had maintained an organized tribal structure and, therefore, was entitled to off-reservation fishing rights pursuant to the Treaty of Point Elliott. Indeed, two other tribes did precisely this. Specifically, in Washington I, the district court held that the Stilla-guamish Tribe and Upper Skagit Tribe were both entitled to off-reservation fishing rights pursuant to the Treaty of Point Elliott despite the fact that they were not at the time recognized as tribes by the federal government. United States v. Washington, 384 F.Supp. 312, 378-79, 406 (W.D.Wash.1974), aff'd, 520 F.2d 676 (9th Cir.1975) (“Washington I ”). We affirmed:
The Stillaguamish and Upper Skagit Tribes ... are not recognized as organized tribes by the federal government. ... Evidence supported the court’s findings that the members of the two tribes are descendants of treaty signatories and have maintained tribal organizations. We therefore affirm the *1165 district court’s conclusion that the Stilla-guamish and Upper Skagit Tribes are entities possessing rights under the Treaty of Point Elliott.
Washington I, 520 F.2d at 692-93: Nor, finally, has the Samish Tribe alleged, much less proved, that the evidence demonstrating that it was entitled to off-reservation fishing rights pursuant to the Treaty of Point Elliott was unavailable at the time of the trial held in Washington II to adjudicate this issue.
Because the Samish Tribe has presented no evidence that it was precluded from doing precisely what the Stillaguamish and Upper Skagit Tribes did, it has not shown that it was “ ‘prevented ... from proceeding with the prosecution or defense of the action in a proper fashion,’ ” Op. at 1159, such that its recognition as a tribe now should permit it to set aside the judgment in Washington II.[4]
B.
Despite this clear, consistent and controlling authority, the majority opinion “concluded] that the Samish were effectively prevented from proving their tribal status ‘in a proper fashion’ ” for three reasons:
the government’s ‘excessive delays and ... misconduct’ in withholding of recognition from the Samish, a circumstance beyond their control; [2] the government’s position in Washington II that federal recognition was necessary and that future federal recognition might justify revisiting the treaty rights issue; and [3] the district court’s erroneous conclusion that nonrecognition was decisive and wholesale adoption of the United States’ boilerplate findings of fact in Washington II. ...
Op. at 1159. But none of these factors supports granting the Samish Tribe’s Rule 60(b)(6) motion.
First, although the Samish Tribe initially applied for federal recognition in 1972 and were not finally recognized until 1996, whether the Samish Tribe was entitled to off-reservation fishing rights pursuant to the Treaty of Point Elliott was an issue tried and submitted before the district court in Washington II in 1977. Greene v. Babbitt, 943 F.Supp. 1278, 1281 (W.D.Wash.1996) (“Greene III”) (date of initial application for federal recognition); 61 Fed.Reg. 15825 (date of federal recognition); Washington II, 641 F.2d at 1371 n. 4 (date of submission before district court). Thus, the majority if not all of the “ ‘excessive delays and ... misconduct,’ ” Op. at 1159, on which the majority opinion relies occurred after the issue was tried and submitted in Washington II.
Further, as noted above, there is no showing that the five-year delay immediately following the Samish Tribe’s application for federal recognition to the BIA precluded the Samish Tribe from submitting to the district court in Washington II the same evidence of having maintained an organized tribal structure that it had submitted or thereafter would submit to the BIA. Nor is there evidence that the Samish Tribe applied for a postponement of their treaty-rights trial and submission to allow the BIA to determine its recognition claim.
Second, “the government’s position in Washington II that federal recognition *1166 was necessary and that future federal recognition might justify revisiting the treaty rights issue,” Slip op. at 122, is irrelevant to whether a case is made out for Rule 60(b)(6) relief. The government’s position in no way hindered, much less precluded, the Samish Tribe from offering evidence in the Washington II district court trial of having maintained an organized tribal structure that could have resulted in a finding by that district court that the Samish were entitled to off-reservation fishing rights pursuant to the Treaty of Point Elliott, as did the unrecognized Stilla-guamish and Upper Skagit Tribes. Nor can the Samish Tribe claim the government is estopped to require evidence of having maintained an organized tribal structure by its statement that the issue of treaty rights might be subject to review were the Samish Tribe federally recognized. Any reliance on these statements was unreasonable in view of our holdings. As noted above, even prior to Washington II, we had held in Washington I that federal recognition as a tribe is not a necessary precondition for off-reservation fishing rights pursuant to the Treaty of Point Elliott and that district courts are competent to make the necessary determinations:
The Stillaguamish and Upper Skagit Tribes ... are not recognized as organized tribes by the federal government. ... Nonrecognition of the tribe by the federal government and the failure of the Secretary of the Interior to approve a tribe’s enrollment may result in loss of statutory benefits, but can have no impact on vested treaty rights. Whether a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained an organized tribal structure is a factual question which a district court is competent to determine.... Evidence supported the court’s findings that the members of the two tribes are descendants of treaty signatories and have maintained tribal organizations. We therefore affirm the district court’s conclusion that the Stilla-guamish and Upper Skagit Tribes are entities possessing rights under the Treaty of Point Elliott.
Washington I, 520 F.2d at 692-93 (internal citations omitted). Accordingly, in Washington II, we characterized arguments otherwise as “clearly contrary to” and “foreclosed by well-settled precedent.” 641 F.2d at 1371 (emphasis added).
Third, nor is “the district court’s erroneous conclusion that nonrecognition was decisive and wholesale adoption of the United States’ boilerplate findings of fact in Washington II,” Op. at 1159, relevant. On appeal, as noted above, we expressly corrected the district court’s erroneous conclusion. Washington II, 641 F.2d at 1371 (“[The district court’s] conclusion is clearly contrary to our prior holding and is foreclosed by well-settled precedent.”). Noting that”[t]he district court’s statement that federal nonrecognition is decisive, together with its listing of other purported considerations, makes it difficult for us to determine the precise basis for the court’s holding that the tribes may not exercise treaty rights,” we then “examine[d] the record” ourselves “to determine whether the district court reached the correct result.” Id. at 1372.
[T]he district court specifically found that the appellants had not functioned since treaty times as ‘continuous separate, distinct and cohesive Indian cultural or political communit(ies).’
After close scrutiny, we conclude that the evidence supports this finding of fact. Although the appellants now have constitutions and formal governments, the governments have not controlled the lives of the members. Nor have the appellants clearly established the continuous informal cultural influence they concede is required.
*1167 The appellants’ members are descended from treaty tribes, but they have intermarried with non-Indians and many are of mixed blood. That may be true of some members of tribes whose treaty status has been established. But unlike those persons, those who comprise the groups of appellants have not settled in distinctively Indian residential areas.
We cannot say, then, that the finding of insufficient political and cultural cohesion is clearly erroneous.
Washington II, 641 F.2d at 1373-74 (emphasis added; internal citations omitted).
Indeed, the argument that the district court’s erroneous conclusion of law in Washington II so “permeated the entire factual history,” id. at 1375 (Canby, J., dissenting), that the findings of fact could not be relied upon even by this court when it applied the correct standard is one that was heralded by the dissent in Washington II and, as demonstrated above, rejected by the majority:
My difference with the majority is that I am unable to say that the findings of the district court resolve the determinative question of tribal continuity or provide us with the means to do so upon review.
[T]he conclusions of law help to illustrate the deficiencies of the findings of fact upon which the decision of the district court is based. The findings that appellants had not maintained a ‘continuous separate, distinct and cohesive Indian cultural or political communitfies)’ or ‘organized tribal structure(s) in a political sense’ amounted in context to findings that appellants lacked federal recognition or attributes necessarily dependent upon federal recognition. These findings consequently do not resolve the crucial factual issue and cannot support the judgment.
Application of the proper legal standards to this case requires new determination of fact, and possibly additional evidence relating to the political organization of the relevant tribes at treaty times. I would therefore remand the matter to the district court for determinations whether appellants have maintained tribal structures reflecting the degree of organization that existed at the time of the treaties, with reasonable allowances for adaptation to changing conditions, and whether some defining characteristic of the original tribes persists in appellants as evolving tribal communities.
Id. at 1374, 1375-76 (Canby, J., dissenting). The majority opinion recognizes that this is an argument already made and rejected, Op. at 1155 n. 3, but pays no heed to the crucial finding of not having maintained an organized tribal structure, approved by our decision. Such insouciance to our precedent is inadvisable.
II.
Although acknowledging that “we have never explicitly held that federal recognition necessarily entitles a signatory tribe to exercise treaty rights,” the majority opinion asserts that “this is an inevitable conclusion.” Op. at 1158. Again, this is contrary to our precedent.
In Greene I, what was thereafter recognized as the Samish Tribe appealed to the district court from the BIA’s denial of the Samish Tribe’s petitions for recognition. 996 F.2d at 975. The Tulalip Tribe moved to intervene, asserting “two related interests”: (1) “that their treaty fishing allocations are threatened by dilution” because the “renewed administrative inquiry into the Samish tribal status will raise nearly identical questions” as those relevant to the Samish Tribe’s treaty status; and (2) that “parallel determinations by the BIA will undermine the precedential effect” of Washington I and Washington II. Id. at 976-77.
*1168 The district court denied the motion, holding “that the action did not implicate treaty claims,” and we affirmed. Id. at 975. As to the first asserted interest, we held that federal recognition “serves a different legal purpose and has an independent legal effect” than does a determination whether the Samish Tribe has treaty rights: “Even if they obtain federal tribal status, the Samish would still have to confront the decisions in Washington I and Washington II before they could claim fishing rights.” Id. at 976-77. As to the second asserted interest, we noted that “the district court ruled expressly that the ALJ ‘will not consider’ treaty rights” and “that the Samish may not use the reopened hearing [on federal recognition] to attack the [Washington II ] decision.” Id. at 977. Further, it held that “[a]ny attempt to relitigate treaty fishing rights would occur in the separate, ongoing Washington I forum, where the Tulalip are already parties.” Id. We continued: Washington I “is the forum that will resolve ultimately any attempt to reallocate treaty fishing rights and that is the forum where the Tulalip and all other interested parties can have their say.” Id. at 977-78 (emphasis in original).
Our holding in Greene I that the proper fora — if any — to relitigate the Samish Tribe’s treaty rights were Washington I and Washington II and our promise to the Tulalip Tribe that it would have an opportunity to protect its interests in those fora compels the conclusion that federal recognition does not necessarily entail treaty status. Indeed, this-is clearly what we meant when we said: “Allowing the Tulal-ip to intervene would only further confuse the issues and postpone what may be inevitable: a direct challenge to the allocation of treaty fishing rights, which would be fully and independently litigated in the Washington I forum.” Id. at 978 (emphasis added). It would have been an empty promise — indeed, a complete deprivation of due process — to deny the Tulalip Tribe’s motion to intervene in the Samish BIA recognition proceedings on the basis that it could later protect its treaty rights in the Washington I and Washington II courts, while all along assuming that by virtue of the Samish Tribe gaining federal recognition, the Washington I and Washington II courts would be required to grant the Samish Tribe treaty rights. If that was the case, where then was the Tulalip Tribe to protect its interests? Elementary principles of due process, such as the right to present evidence and to be heard before property rights are taken, require that a tribe challenging the Samish Tribe’s claims to treaty rights have an opportunity to disprove the maintenance of organized tribal structure and not be precluded from offering such proof by an administrative agency determination from which the challenging tribe was excluded.
Indeed, the majority opinion’s “inevitable conclusion,” Op. at 1158, is precisely the argument advanced by the dissent in Greene I, and rejected by the majority opinion there. Dissenting, Judge Reinhardt argued that “federal recognition is tantamount to acknowledgment by the federal government of tribal entitlement to treaty rights,” id. at 980-81, and therefore concluded:
As a practical matter, if the BIA reconsiders its earlier decision, granting federal recognition to the Samish, the agency’s determination that the Samish have “maintained tribal political influence or other authority,” 25 C.F.R. § 83.7(c), will undoubtedly carry great weight in any judicial reconsideration of Samish entitlement to treaty fishing rights.
Id. at 982. To this, the majority opinion replied:
The dissent speculates that if the BIA reverses its decision and recognizes the Samish as an official tribe, this “will *1169 undoubtedly carry great weight in any judicial reconsideration of Samish entitlement to treaty fishing rights.” In fact, such a decision would have marginal influence at best. The Washington I court need not accord any deference to an agency proceeding that has been expressly limited to matter other than rights under the 1855 treaty.
Id. at 978 (emphasis added).
Our holding in Greene I that the district court “need not accord any deference” to the BIA’s recognition of the Samish Tribe, id. at 978, was affirmed in Greene II. There, the Secretary of the Interior appealed the district court’s decision that it was formally to adjudicate under the Administrative Procedure Act whether the Samish should be recognized as a tribe. Greene II, 64 F.3d at 1268. The Tulalip Tribe appeared as amicus curiae, and argued that the Samish were collaterally es-topped from litigating tribal recognition by virtue of Washington II. Id. at 1269. We disagreed, holding that “the recognition of the tribe for purposes of statutory benefits is a question wholly independent of treaty fishing rights.” Id. at 1270. Dissenting, Judge Wright argued from the same premise as does the majority opinion here:
Washington II precludes a finding that the Samish Tribe has ‘maintained tribal political influence or other authority over its members as an autonomous entity throughout history until the present.’ 25 C.F.R. § 83.7(c). Washington II involved the same factual inquiry into the historicity of the present Samish Tribe. Such an inquiry is a necessary condition both for treaty recognition and for statutory recognition under the current BIA regulations. We have here substantial overlap in evidence and argument, save for subsequently developed evidence; and the claims, although not identical, are closely related. See Restatement (Second) of Judgments, § 27 (1982).
The factual finding regarding the Samish Tribe’s historicity in Washington II precludes what would be a near identical inquiry in this case.
Id. at 1276. The majority opinion in Greene II rejected this argument, noting that in Greene I “[w]e ... squarely rejected the Tulalip’s position that federal recognition of the Samish would be inconsistent with Washington I and Washington II” and “agreed with the district court ... that the question of federal recognition as a tribe ‘did not implicate treaty claims.’ ” Id. at 1271.
Indeed, basic rules of judicial review, collateral estoppel and evidence dictate this result. The factual findings underlying the BIA’s recognition of the Samish Tribe are adjudicative in nature and, thus, not entitled to Chevron deference. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Further, any proceeding in district court resulting from the Samish Tribe’s successful Rule 60(b)(6) motion will not be the equivalent of an appeal of the BIA’s underlying factual findings, and, thus, the district court does not owe those factual findings the sort of deference reviewing courts typically owe. Further, even independent of Greene II, the Tulalip Tribe and others not a party to the BIA proceedings and who did not control those parties to the proceedings, did not agree to be bound by the proceedings and were not represented in the proceedings, cannot be collaterally es-topped from relitigating the BIA’s underlying factual findings. See Restatement (Second) of Judgments §§ 27, 39-42 (1982). Finally, any testimony introduced during the BIA proceedings is hearsay as to treaty-rights litigation and should be barred upon objection by the Tulalip Tribe or others that did not themselves nor did *1170 their predecessors in interest have “an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination” during the BIA proceedings. Fed.R.Evid. 804.
Our precedent holds — and, for the reasons explained above, rightly so — that “[fjederal recognition does not self-execute treaty rights claims,” Greene I, 996 F.2d at 977, and “[e]ven if the federal government says that the Samish are an official Indian tribe, whether they may fish as a treaty tribe in common with [other tribes] is another question.” Id. at 975. The majority opinion’s “inevitable conclusion” to the contrary, Op. at 1158, overrules this prior circuit precedent.
III.
Until now, our precedent has been both clear and consistent that whether a group of Native Americans are recognized as a tribe by the federal government is a distinct legal inquiry from whether that same group of Native Americans qualify for off-reservation fishing rights pursuant to the Point Elliott and related treaties; and, equally so, that recognition as a tribe is not a necessary precondition for off-reservation fishing rights. Thus, the fact that the Samish Tribe was not recognized by the federal government at the time of Washington II in no way prevented it (as did the Stillaguamish and Upper Skagit Tribes) from putting forth the type of evidence of having maintained an organized tribal structure that could have resulted in a finding by the district court in Washington II that the Samish Tribe was entitled to off-reservation fishing rights pursuant to the Treaty of Point Elliott. Nor has the Samish Tribe adduced any evidence that it was precluded from so doing.
Further, as we have previously held, federal recognition does not compel status under the Point Elliott and related treaties, and, indeed, a district court “need not accord any deference to an agency proceeding that has been expressly limited to matter other than rights under the 1855 treaty.” Greene I, 996 F.2d at 978.
Accordingly, I would affirm the order of the district court.

. Except " 'when an intervening Supreme Court decision undermines an existing precedent of the Ninth Circuit, and both cases are closely on point,’ " "[a] three-judge panel generally has no power to overrule a decision of this court.” Rotee Industries, Inc. v. Mitsubishi Corp., 348 F.3d 1116, 1122 n. 3 (9th Cir.2003). Rather, "[s]uch a ruling may be handed down [only] by an en banc panel of this court or the United States Supreme Court (and state high courts on issues of state law).” Id.

. This precedent in no way renders federal recognition a nullity. Rather, ”[f]ederal recognition brings its own obvious rewards, not the least of which is the eligibility of federal money for tribal programs, social services and economic development.” Greene v. United States, 996 F.2d 973, 978 (9th Cir. 1993) (“Greene I ”).

. In light of this precedent, the majority opinion's statement that “the Samish's inability to exercise their treaty fishing rights hinged on their status as an unrecognized tribe,” Op. at 1155, is inexplicable,

. Nor, as the majority opinion recognizes, is the fact “[t]hat an ALJ arrived at a different factual finding [as to federal recognition] on better evidence ... a reason for granting a Rule 60(b)(6) motion. See Alpine Land & Reservoir Co., 984 F.2d at 1049 (holding that Rule 60(b)(6) 'is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment’).” Op. at 1159.